## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MITCHEL HYMAN, individually and derivatively on behalf of Ramones Productions, Inc., | : : : | |
| Plaintiff, | : : | CIVIL ACTION NO: 1:24-5920 |
| vs. | : : | |
| LINDA CUMMINGS-RAMONE, individually and as a Purported Trustee of the Linda Cummings-Ramone Living Trust and Survivor Trust, | : : : : | |
| Defendant. | : : | |

## COMPLAINT

Plaintiff MITCHEL HYMAN, individually and derivatively on behalf of Ramones Productions, Inc. ("Plaintiff" or "Mr. Hyman"), by and through his undersigned counsel, hereby alleges the following for his Complaint against Defendant LINDA CUMMINGS-RAMONE, individually and as a purported Trustee of the Linda Cummings-Ramone Living Trust and Survivor Trust[1] ("Defendant" or "Ms. Cummings-Ramone").

### NATURE OF THE CLAIMS

1.      This action is between the brother of Joey Ramone (i.e., Mr. Hyman), on the one hand, and the widow of Johnny Ramone (i.e., Ms. Cummings-Ramone"), on the other hand. Joey Ramone and Johnny Ramone were members of one of the most well-known punk rock bands in the world, the Ramones.  Mr. Hyman is and has always been dedicated to honoring his brother's legacy and that of the Ramones, as well as properly discharging his duties and responsibilities to Ramones Productions, Inc. ("RPI" or the "Company"), the entity which

---

[1] The Linda Cummings-Ramone Living Trust and Survivor Trust are referred to herein as the "LCR Trusts."

1

holds the intellectual property rights of the Ramones, and on behalf of which Mr. Hyman serves as a fifty percent (50%) owner, an officer, and a director.

2.      In stark contrast, Defendant, who calls herself "Linda Ramone," is a former Ramones groupie and was the serious girlfriend of Joey Ramone until she engaged in a widely publicized affair with his bandmate, Johnny Ramone, whom she later went on to marry.  Ms. Cummings-Ramone has always had an insatiable personal desire to shine a spotlight on herself. She is dedicated to promoting herself as a self-described professional social media influencer, fashion icon, and celebrity, riding on the coattails of the Ramones and to the detriment of RPI, who she should be promoting,  and Mr. Hyman.  In doing so, Ms. Cummings-Ramone blatantly infringes and dilutes RPI's and Mr. Hyman's intellectual property for her own fame and vanity. She purports to be a Trustee of the LCR Trusts and, in some unidentified manner, the owner of fifty percent (50%) of RPI's outstanding shares.

3.      Ramones are unique in many ways. One of which is that they are the only band of stature where all the members were not related but used the same last name as if they were. That made it easy for Defendant to insert herself into the Ramones legacy as part of the family, the public spokesperson, and to associate her personal brand with Ramones, by using the name "Linda Ramone." Indeed, "Linda Ramone" never existed while her husband, John Cummings (p/k/a Johnny Ramone) was alive. Defendant increasingly adopted the name "Linda Ramone" after Mr. Cummings died.

4.      With the rise of social media, Defendant and her online marketing team set a roadmap and created a narrative to establish her as part of the Ramones family, calling her "a Princess of Punk." Today, Linda Ramone has successfully built a 6-figure social media following (50% more than Joey Ramone, DeeDee Ramone, and Tommy Ramone combined)

by consistently posting Ramones music/images/photos/video and using inside RPI intel to target Ramones fans and create her own image as a Ramone for her sole benefit, at the expense of RPI and Mr. Hyman, the owner of 50% of RPI.

5.    Plaintiff therefore brings the instant lawsuit against Defendant for willful trademark infringement, trademark dilution, and unfair competition under Sections 32 and 43 of the Lanham Act (15 U.S.C. §§ 1114 and 1125(a)) and New York common law, as well as for intentionally breaching RPI's operative corporate governance documents and a 2009 settlement agreement binding the parties (the "2009 Settlement Agreement," a true and correct copy of which is attached hereto as **Exhibit "A"**).  Ms. Cummings-Ramone's conduct threatens serious and irreparable harm to RPI and Mr. Hyman.

**PARTIES**

6.    RPI is a New York corporation. The two currently operative corporate governance documents of RPI are: (1) a 2005 Amended and Restated Shareholders' Agreement (the "2005 Shareholders' Agreement," a true and correct copy of which is attached hereto as **Exhibit "B"**); and (2) a 2009 Amendment to Amended and Restated Shareholders' Agreement (the "2009 Amendment to Shareholders' Agreement," a true and correct copy of which is attached hereto as **Exhibit "C"**).

7.    Mr. Hyman is an individual citizen of the State of New York, with a residential address in Forest Hills, New York.  Mr. Hyman is an officer and director of RPI.  He owns fifty percent (50%) of RPI's outstanding shares.

8.    Ms. Cummings-Ramone is, on information and belief, an individual citizen of the State of California.  Ms. Cummings-Ramone is an officer and director of RPI.  As stated

above, she also purports to be a Trustee of the LCR Trusts and, in some unidentified manner, the owner of the remaining fifty percent (50%) of RPI's outstanding shares.

9.      The LCR Trusts are California entities.

## JURISDICTION AND VENUE

10.     This is a civil action brought under the Trademark Laws of the United States, 15 U.S.C. §§ 1051 *et seq.*, subject matter jurisdiction being conferred by 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338.  Plaintiff's common law claims are joined and related pursuant to 28 U.S.C. §§ 1367(a) and 1338(b).

11.     This Court also maintains subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because (i) Plaintiff Mr. Hyman is an individual citizen of the State of New York; RPI, the corporate entity on behalf of which Mr. Hyman brings derivative claims, is a corporate citizen of the State of New York; and Defendant Ms. Cummings-Ramone and the LCR Trusts are citizens of the State of California, such that Plaintiff and Defendant are completely diverse from one another; and (ii) in light of Defendant's conduct as set forth in this Complaint, Plaintiff seeks in excess of $75,000 in damages, exclusive of interests and costs, in an amount to be fully determined at trial.

12.     This Court has personal jurisdiction over Defendant because the 2009 Settlement Agreement from which this action arises in large part contains an explicit provision stating that "[t]he parties hereby irrevocably consent to the exclusive jurisdiction of the state and federal courts located in the State of New York, County of New York, to resolve any dispute arising out of or relating to this Agreement.  Each party hereby agrees to the venue of such courts and waives any claims of inconvenient forum."  Ex. A. at ¶ 12.  Furthermore, Defendant has purposefully availed herself of, and purposefully directed her infringing and otherwise

unlawful actions to, the State of New York, which has caused Plaintiff harm in the State of New York.

13.     Venue is proper in this Judicial District because the 2009 Settlement Agreement from which this action arises in large part contains an explicit provision stating that "[t]he parties hereby irrevocably consent to the exclusive jurisdiction of the state and federal courts located in the State of New York, County of New York, to resolve any dispute arising out of or relating to this Agreement.  Each party hereby agrees to the venue of such courts and waives any claims of inconvenient forum." *Id.*  Venue is also proper in this Judicial District under 28 U.S.C. § 1391(b) and 28 U.S.C. § 1391(c), as Defendant is subject to personal jurisdiction in this Judicial District, Defendant conducts business in this Judicial District, and Defendant's wrongful acts of trademark infringement, trademark dilution, unfair competition and breach of contract have taken place and are continuing to take place in this Judicial District, thereby causing harm to Plaintiff in this Judicial District.

## FACTS COMMON TO ALL CLAIMS

### A.     General Background

14.     This Complaint relates to a dispute between Mr. Hyman and Ms. Cummings-Ramone, as the shareholders, directors, and officers of RPI—which, again, is the corporation that owns and controls the intellectual property and other rights and interests in the seminal band, the Ramones.

15.     The Ramones were an iconic punk rock band that formed in Forest Hills, Queens in 1974.  The Ramones are one of the most renowned and important bands of the punk rock movement, a music genre that developed in the early 1970s.  Unlike many bands and artists at that time, the Ramones were tough and gritty; they were irreverent and were famous for

wearing T-shirts, leather jackets and worn-out jeans. The band achieved success by forming and maintaining a street level bond with the working-class people who rejected the values of the wealthy elite, including their privilege, culture, and lifestyle.

16. The Ramones have a large worldwide fan base, many of whom are eager to engage with the band and its interest holders.

17. "Ramone" has always been a fictitious name – a pseudonym the original band members adopted as a professional stage name for the band. Each member had his own birth surname but used the stage name "Ramone" as his assumed surname for professional purposes. In the original band, member Jeffrey Hyman (the lead singer of the Ramones) was "Joey Ramone," John Cummings was "Johnny Ramone," Thomas Erdelyi was "Tommy Ramone," and Douglas Colvin was "Dee Dee Ramone." In later years when members of the original line-up or their successors were replaced, Marc Bell was referred to as "Marky Ramone," Richard Reinhardt was referred to as "Richie Ramone," and Christopher Joseph Ward was referred to as "CJ Ramone." Despite this, none of the actual band members ever legally changed their surname to "Ramone," nor did they use the "Ramone" surname other than in connection with their membership in the band.

18. RPI entered into agreements with band members (or their estates) using the band members' birth names. Moreover, as addressed below, the extent of any rights for the ongoing use of the "Ramone" pseudonym, as well as other trademarks owned by RPI, was specifically outlined in the agreements and other corporate documents referenced below.

**B.** **RPI'S Corporate Governance Structure, and Mr. Hyman and Ms. Cummings-Ramone's Roles Therein**

19. Despite the Ramones band having been formed in 1974, RPI did not have formal corporate governance documents until the execution of its original (no longer operative)

Shareholders' Agreement in 2002 (the "2002 Shareholders' Agreement"). Pursuant to Schedule 1 of the 2002 Shareholders' Agreement, the Estate of Jeffrey Hyman p/k/a Joey Ramone (the "Estate of Hyman") then owned one hundred (100) shares of RPI's common stock issued and outstanding, and John Cummings then owned one hundred (100) shares of RPI's common stock issued and outstanding.

20.     The 2002 Shareholders' Agreement was signed by (a) John Cummings as President on behalf of RPI; (b) both Charlotte Lesher[2] and Mr. Hyman as Representatives of the Estate of Hyman; and (c) John Cummings in his individual capacity.

21.     In 2005, the year after John Cummings passed away, RPI executed the currently operative 2005 Shareholders' Agreement, which replaced in full and rendered null and void the 2002 Shareholders' Agreement.  *See* Ex. B.  Pursuant to Schedule 1 of the 2005 Shareholders' Agreement, the Estate of Hyman then owned one hundred (100) shares of RPI's common stock issued and outstanding, and the John Family Trust of 1997, u/d/t 2/12/97 (the "Estate of Cummings") owned the remaining one hundred (100) shares of RPI's common stock issued and outstanding.  *Id.*

22.     In the 2005 Shareholders' Agreement, Ms. Cummings-Ramone represented and warranted "that she [was] the legal representative of the Estate of Cummings and [was] legally and duly authorized to act on its behalf."  *Id.* Charlotte Lesher and Mr. Hyman likewise stated that they were the representatives of the Estate of Hyman and "shall act on its behalf."  *Id.*

23.     The 2005 Shareholders' Agreement was signed by (a) Charlotte Lesher as Chief Executive Officer of RPI; (b) both Charlotte Lesher and Mr. Hyman as Representatives of the

---

[2] Charlotte Lesher was the mother of Mr. Hyman and Jeffrey Hyman, who passed away in 2007. Prior thereto, Ms. Lesher was a director of RPI and executor of the Estate of Hyman.

Estate of Hyman; and (c) Ms. Cummings-Ramone as Representative of the Estate of Cummings, who signed her name as "Linda Cummings." *Id.*

24.     On July 1, 2009, the currently operative 2009 Amendment to Shareholders' Agreement was executed. *See* Ex. C. The 2009 Amendment to Shareholders' Agreement amends—but does not otherwise modify or replace—the 2005 Shareholders' Agreement. *Id.*

25.     Section 1 of the 2009 Amendment to Shareholders' Agreement states, *inter alia*, that "upon the assignment and transfer of the Shares held by the Estate of Hyman to Mr. Hyman (it being acknowledged that physical stock certificates have not previously been issued by the Company to any Shareholder), Mr. Hyman shall be substituted as a shareholder of the Company in the place of the Estate of Hyman for all purposes." *Id.* Section 1 of the 2009 Amendment also states, *inter alia*, that the 2005 Shareholders' Agreement "shall be amended and modified to replace the references to the Estate of Hyman with references to Mr. Hyman." *Id.*

26.     Section 2 of the 2009 Amendment to Shareholders' Agreement establishes that the then-current directors of RPI were Mr. Hyman, Mr. Hyman's appointee, Mr. Frey, Ms. Cummings-Ramone, and Ms. Cummings-Ramone's appointee, John Cafiero. *Id.*

27.     Section 3 of the 2009 Amendment to Shareholders' Agreement makes clear that Mr. Hyman and Ms. Cummings-Ramone are Co-Presidents and Co-Secretaries of RPI. *Id.*

28.     The 2009 Amendment to Shareholders' Agreement was signed by (a) Ms. Cummings-Ramone as Co-President of RPI; (b) Mr. Hyman as Representative of the Estate of Hyman; (c) Ms. Cummings-Ramone as Trustee of the Estate of Cummings; and (d) Mr. Hyman individually. *Id.*

29.     The 2005 Shareholders' Agreement and the 2009 Amendment to Shareholders' Agreement were never subsequently modified.

30.     Nowhere in the 2005 Shareholders' Agreement nor the 2009 Amendment to Shareholders' Agreement is there any indication that the RPI shares owned by the Estate of Cummings had been or were being transferred to Ms. Cummings-Ramone or anyone else.

31.     However, in or around 2016, Ms. Cummings-Ramone purported to transfer—without authorization from Mr. Hyman or modification of any of the above-referenced corporate governance documents—all shares from the Estate of Cummings, where they resided following John Cummings' death, to the LCR Trusts, for and of which Ms. Cummings-Ramone purports to serve as a Trustee and beneficiary, respectively.

32.     In view of the foregoing, this pleading presumes that the sole shareholders of RPI are Mr. Hyman (50%) and, on information and belief, the LCR Trusts (50%), with Ms. Cummings-Ramone acting as a Trustee thereof.[3]

33.     Given this 50/50 ownership split, as well as the fact that the RPI Board of Directors is currently comprised of four (4) members (i.e., Mr. Hyman and his personally appointed designee, on the one hand, and Ms. Cummings-Ramone and her personally appointed designee, on the other hand), Mr. Hyman appropriately brings claims against Ms. Cummings-Ramone for her wrongdoing in connection with the Ramones intellectual property derivatively, on behalf of RPI.  Mr. Hyman also brings claims in his individual capacity, arising from Ms. Cummings-Ramone's wrongdoing in connection with intellectual property rights belonging to Mr. Hyman himself.

---

[3] However, Mr. Hyman reserves his right to challenge the LCR Trusts' ownership of RPI shares, as well as Ms. Cummings-Ramone's status as a Trustee of the LCR Trusts with the authority to act on behalf thereof.

C. **Trademarks At Issue in This Litigation—Including The Famous RAMONES Mark**

34.   Ms. Cummings-Ramone has violated RPI's rights and Mr. Hyman's rights in various Ramones-related trademarks.

35.   Among other types of intellectual property rights, RPI owns the following Ramones-related trademarks:

a.   the trademark RAMONES, which RPI and/or its predecessors or authorized licensees have used in commerce consistently in connection with T-shirts and hats, pre-recorded vinyl records, DVDs and CDs featuring music and musical entertainment, downloadable digital sound and video recordings from the Internet, recordings featuring music and musical entertainment, posters, photographs, decals and stickers since as early as 1976, and for which RPI owns United States Trademark Registration Nos. 3,056,896 and 4,905,059 (the "RAMONES Mark").   True and correct copies of United States Trademark Registration Nos. 3,056,896 and 4,905,059 are attached hereto as **Exhibit "D"** and **Exhibit "E,"** respectively.

b.   the trademark GABBA GABBA HEY, which RPI and/or its predecessors or authorized licensees have used in commerce consistently in connection with T-shirts and other music- and entertainment-related goods and services, as well as memorabilia, since as early as 2019, and for which RPI owns United States Trademark Registration No. 5,740,022 (the "GABBA GABBA HEY Mark").   A true and correct copy of United States Trademark Registration No. 5,740,022 is attached hereto as **Exhibit "F."**

c.   the trademark HEY HO! LET'S GO, which RPI and/or its predecessors or

10

authorized licensees have used in commerce consistently in connection with T-shirts and other music- and entertainment-related goods and services, as well as memorabilia, since as early as 2019, and for which RPI owns United States Trademark Registration No. 5,715,769 (the "HEY HO! LET'S GO Mark").  A true and correct copy of United States Trademark Registration No. 5,715,769 is attached hereto as **Exhibit "G."**

d.  the trademark BLITZKRIEG BOP, which RPI and/or its predecessors or authorized licensees have used in commerce consistently in connection with T-shirts and other music- and entertainment-related goods and services, including memorabilia, since as early as 2019, and for which RPI owns United States Trademark Registration No. 5,740,021 (the "BLITZKRIEG BOP Mark").  A true and correct copy of United States Trademark Registration No. 5,740,021 is attached hereto as **Exhibit "H."**

e.  the trademark ROCK 'N' ROLL HIGH SCHOOL, which RPI and/or its predecessors or authorized licensees have used in commerce consistently in connection with T-shirts and other music- and entertainment-related goods and services, including memorabilia, since as early as 2019, and for which RPI owns United States Trademark Registration No. 5,740,023 (the "ROCK 'N' ROLL HIGH SCHOOL Mark").  A true and correct copy of United States Trademark Registration No. 5,740,023 is attached hereto as **Exhibit "I."**

f.  the following logo (the "RAMONES Logo"), which RPI and/or its predecessors or authorized licensees have used in commerce consistently in connection with T-shirts and other music- and entertainment-related goods and services,

11

including memorabilia, since as early as 1976:



36.     The RAMONES Mark, the GABBA GABBA HEY Mark, the HEY HO! LET'S GO Mark, the BLITZKRIEG BOP Mark, the ROCK 'N' ROLL HIGH SCHOOL Mark, and the RAMONES Logo are collectively referred to herein as the "RPI Trademarks."

37.     In addition to the RPI Trademarks, also at issue in this litigation is the trademark JOEY RAMONE, which is owned by Mr. Hyman.

38.     Since at least as early as 1974, Mr. Hyman's predecessors, including his brother Jeffry, authorized licensees, and, ultimately, Mr. Hyman himself, have consistently used the trademark JOEY RAMONE in commerce in connection with T-shirts and other music- and entertainment-related goods and services, including memorabilia, as well as live events such as the annual Joey Ramone birthday bash and fundraising for numerous charities.  Mr. Hyman is the owner of US Trademark Application Serial No. 98,340,412 for the trademark JOEY RAMONE (the "JOEY RAMONE Mark").   A true and correct copy of United States Trademark Application Serial No. 98,340,412 is attached hereto as **Exhibit "J."**

39.     Attached hereto as **Exhibit "K"** are true and correct copies of representative samples of materials showing RPI's and/or its predecessors' or authorized licensees' use of the RPI Trademarks in connection with the goods and services referenced in Paragraph 35 above; attached as **Exhibit "L"** hereto are true and correct copies of representative samples of

materials showing Mr. Hyman's predecessors, authorized licensees,' and/or Mr. Hyman's use of the JOEY RAMONE Mark in connection with the goods and services referenced in Paragraph 38 above.

40.     As a result of RPI's and its predecessors' and authorized licensees' widespread, exclusive, and continuous use in commerce of the RPI Trademarks for many years to identify RPI as their source, there can be no dispute that RPI owns valid and subsisting statutory and common law rights in the RPI Trademarks.  Likewise, as a result of Mr. Hyman's and his predecessors' and authorized licensees' widespread and continuous use in commerce of the JOEY RAMONE Mark for many years, there can be no dispute that Mr. Hyman owns valid and subsisting statutory and common law rights in the JOEY RAMONE Mark.

41.     Indeed, the RPI Trademarks are distinctive to consumers.  RPI and its predecessors and authorized licensees have expended substantial time, money, and resources marketing, advertising, and promoting T-shirts and other music- and entertainment-related goods and services bearing the RPI Trademarks, including through internet commerce, retail stores, and at concerts and live performances at which RPI and its predecessors and authorized licensees have sold such goods and services to fans of the iconic Ramones band for many years.  Likewise, the JOEY RAMONE Mark is distinctive to consumers.  Likewise, Mr. Hyman and his predecessors and authorized licensees have expended substantial time, money, and resources marketing, advertising, and T-shirts and other music- and entertainment-related goods and services bearing the JOEY RAMONE Mark, including through internet commerce, retail stores, and at concerts and live performances, at which Mr. Hyman and his predecessors and authorized licensees have sold such goods and services to fans of the iconic Ramones band for many years.

42.     As a result of RPI's and its predecessors' and authorized licensees' expenditures and efforts, the RPI Trademarks have come to signify the high quality of the associated goods and services, and they have acquired very significant distinction, reputation, and valuable goodwill belonging exclusively to RPI.   Likewise, as a result of Mr. Hyman's and his predecessors' and authorized licensees' expenditures and efforts, the JOEY RAMONE Mark has come to signify the high quality of the associated goods and services, and they have acquired very significant distinction, reputation, and valuable goodwill belonging exclusively to Mr. Hyman.

43.     The RPI Trademarks—in particular, the RAMONES Mark—have received significant, unsolicited coverage in various media.   Examples of such unsolicited media coverage are attached hereto as **Exhibit "M."**

44.     The RAMONES Mark is by far the most well-known of the RPI Trademarks and, as a result of its distinctiveness and widespread use throughout the United States by RPI and/or its predecessors and authorized licensees in connection with music-related services and memorabilia since as early as 1976, the RAMONES Mark is a famous trademark within the meaning of Section 43(c) of the Lanham Act, and it became famous well before the unauthorized conduct of Defendant addressed in this pleading.

45.     RPI has scrupulously enforced and protected the RPI Trademarks against past infringements.   Likewise, Mr. Hyman has scrupulously enforced and protected the JOEY RAMONE Mark against past infringements.

**D.     Documents Governing the Appropriate Use of the Trademarks at Issue**

46.     The following specific provisions of the 2005 Shareholders' Agreement, the 2009 Settlement Agreement, and a 2019 final award from an arbitration proceeding govern the

appropriate use of the RPI Trademarks, as well as Mr. Hyman's rights in the JOEY RAMONE

Mark.  As discussed in detail in Section "E" below, the binding provisions in these documents

have been repeatedly violated by Ms. Cummings-Ramone.

### i.    The 2005 Shareholders' Agreement

47.    Section 9(b) of the 2005 Shareholders' Agreement makes clear that RPI owns

the intellectual property of the Ramones band, including the RPI Trademarks, and that

unanimous consent of the RPI Board of Directors is required prior to individual shareholder's

exploitation of RPI Trademarks for commercial purposes:

> (b) <u>Merchandising.</u> The Company, through its directors and officers, shall control the exploitation, merchandising and licensing of memorabilia, products, apparel and intellectual property (collectively, the "Intellectual Property") related to the Ramones. **Subject to the unanimous consent of the Board of Directors and Section 12(b)(iv), no Shareholder shall individually exploit, merchandise or license the Ramones' memorabilia, products, apparel or intellectual property for product endorsements and merchandising rights of any nature whatsoever**. Each Shareholder agrees to execute, or cause the Company to execute, such additional agreements, instruments or documents necessary to assign, reflect or perfect ownership of the Intellectual Property to, by or for the Company.

*See* Ex. B at Section 9(b) (emphasis added).

48.    In addition, Section 12(b)(iv) of the 2005 Shareholders Agreement makes clear

that Mr. Hyman is owner and exclusive licensee of the JOEY RAMONE Mark:

> (iv) <u>Permitted Competition.</u> **Each Shareholder is granted an exclusive license to its respective professional name ("Joey Ramone" or "Johnny Ramone," as the case may be) to use and exploit it in all industries, including, but not limited to, motion pictures, television, radio, music publishing and songwriting, literary writing and publishing, theatrical engagements, personal appearances, public appearances, recordings reproduced by any method now known or hereafter known, publications, likeness, biographical material, voice and talents for purposes of advertising and trade and for product endorsements and merchandising rights of any nature whatsoever.**

*See id.* at Section 12(b)(iv) (emphasis added).

15

### ii.   The 2009 Settlement Agreement

49.   The 2009 Settlement Agreement, which was executed by the Estate of Jeffrey Hyman (signed by Mr. Hyman as Co-President of RPI) and the Estate of Cummings (signed by Ms. Cummings-Ramone as Co-President of RPI) in connection with the 2009 Amendment to Shareholders' Agreement, contains additional instruction pertaining to the use of the RPI Trademarks and the JOEY RAMONE Mark. *See* Ex. A.

50.   Specifically, Section 5 of the 2009 Settlement Agreement states:

**The parties affirm the provisions of Section 9(b) and 12(b)(iv) of the Shareholders Agreement and the procedures for the use of Ramones Intellectual Property contained therein. The parties further agree that, except as otherwise permitted by law, any use or exploitation of Ramones Intellectual Property (including the Ramones name, logos, music, lyrics, photographs, images, video, or other audio-visual content) by the Estate of Hyman on the one hand (as to Joey Ramone), or the John Family Trust, on the other hand (as to Johnny Ramone), for or in connection with any of their separate or individual projects or promotions (the "Individual Projects"), shall require the prior written approval from RPI or the other shareholder (i.e., the Estate of the Trust, as the case may be),** such approval not to be unreasonably withheld, delayed, or conditioned. Notwithstanding the foregoing, the parties further agree that: (a) both the Estate and the Trust may utilize the Ramones Presidential Seal logo (including the slogan "Hey Ho Let's Go" or "Look Out Below" as part of the logo) in connection with Individual Projects, provided, however, that any such use of the Presidential Seal logo shall not: (i) reference "the Ramones" within or in association with the logo and may reference only the name of Joey Ramone for Individual Projects of the Estate and only the name of Johnny Ramone for Individual Projects of the Trust, or (ii) permit the co-branding of the name or logo of any unaffiliated third-party within or as part of the logo; and (b) subject to the terms hereof, no claim will be asserted or advanced by the Estate or the Trust for uses of Ramones Intellectual Property by either of them prior to the date hereof; including uses that are alleged to have been made without full and proper authorization pursuant to Section 9(b) of the Shareholders Agreement and this paragraph 5.

*Id.* at Section 5 (emphasis added).

### iii.   The 2019 Arbitration Final Award

51.     A 2019 final award from an arbitration proceeding between the parties further clarifies what constitutes impermissible use of the RPI Trademarks.

52.     By way of background, in or around 2018, the relationship between Ms. Cummings-Ramone and Mr. Hyman was particularly tumultuous.  This was a result of, *inter alia*, Ms. Cummings-Ramone's social media campaigns (through which, as discussed in greater detail in the Section below she referred to herself as "Linda Ramone" and, upon information and belief, for certain of which she received compensation) aimed at establishing Ms. Cummings-Ramone as a professional social media "influencer," fashion icon, and public figure to the detriment of RPI and in a manner that was not permitted by the 2005 Shareholders' Agreement or the 2009 Settlement Agreement.

53.     Thus, on or about April 24, 2018, Mr. Hyman commenced an arbitration proceeding pursuant to paragraph 10 of the 2005 Shareholders' Agreement against Ms. Cummings-Ramone and the Estate of Cummings, as well as the LCR Trusts, asserting claims for, *inter alia*, improper and unauthorized use of RPI intellectual property (hereinafter, the "2019 Arbitration").

54.     On May 28, 2019, following a lengthy in-person hearing, Arbitrator Bob Donnelly of the American Arbitration Association's Commercial Arbitration Tribunal rendered a final award in connection with the 2019 Arbitration (the "Final Award," a true and correct copy of which is attached hereto as **Exhibit "N,"** at pp. 42-43).

55.     In the Final Award, Arbitrator Donnelly found, among other things, that Ms. Cummings-Ramone had infringed on the RPI Trademarks. Importantly, Arbitrator Donnelly held that:

17

**(1) LCR is barred from all future uses of the term "Ramones Ranch" or "#ramonesranch" or other similar social media references**. Nothing contained in this Final Award should be construed to preclude LCR from using the terms "Johnny Ramone Ranch," or "Linda Ramone Ranch," or "Johnny and Linda Ramone Ranch" or "Linda and Johnny Ramone Ranch" and any other comparable social media reference.

**(2) LCR may use the name "Linda Ramone" to present her annual "Johnny Ramone Tribute" event if this event *is solely limited to the life and career of Johnny Ramone*** (e.g. where films are shown about the life of Johnny Ramone, where lectures are being given about his career and where only Johnny Ramone materials (and not Ramones' IP) are being displayed or used in the promotion of this event. **However, if the "Johnny Ramone Tribute" continues to operate in a similar manner to the way this event has been presented in previous years, then LCR must obtain the prior approval of Claimant to use Ramones IP**. . . .

*Id.* at p. 42 (emphasis added).

56.    Pursuant to N.Y. C.P.L.R. § 7510, Mr. Hyman sought to have the arbitration award confirmed in New York State Supreme Court.  In an Order dated June 27, 2020, Judge Arthur F. Engoron of the New York State Supreme Court confirmed the Arbitrator's "actual decision" found on pages 42-43 of the Final Award and directed the Clerk to enter judgment accordingly.  *See* NYSCEF Doc. No. 4, at pp. 42-43.

57.    It is against the foregoing backdrop (i.e., the 2005 Shareholders' Agreement, the 2009 Settlement Agreement, and the 2019 Final Award) that Ms. Cummings-Ramone's infringing and otherwise unlawful conduct with respect to the RPI Trademarks and the JOEY RAMONE Mark must be evaluated.

**E.    Defendant Linda Cummings-Ramone's Unrelenting Quest for Unearned Fame and Wealth by Freeriding on the Goodwill Associated With the RPI Trademarks and the JOEY RAMONE Mark**

58.    In the late 1970s, Defendant, known then as Linda Marie Daniele, from Queens, New York, met the Ramones at CBGBs, a famous punk rock club in New York.  As discussed above, he and Jeffrey Hyman (p/k/a Joey Ramone) were in a romantic relationship in the early

1980s, and at one point were engaged.  However, Defendant began a relationship with the Ramones' lead guitarist, John Cummings (p/k/a Johnny Ramone), while she was still very much Jeffrey Hyman's girlfriend.

59.     Linda Marie Daniele went on to marry John Cummings, who never changed his surname to Ramone, and she then became Linda Cummings.

60.     Shortly after John Cummings died in 2004, Linda became romantically involved with J.D. King, a singer and songwriter.

61.     While residing with J.D. King, with whom she currently lives, she sought to change her legal surname from Cummings to the stage name "Ramone."  (First, in 2008, she purported to change it from Linda Cummings to "Linda Cummings-Ramone," and, then in 2014, she purported to change it from "Linda Cummings-Ramone" to "Linda Ramone.")

62.     Notably, as mentioned above, each and every actual member of the Ramones band since its inception used the "Ramone" surname solely as a pseudonym rather than a legal name or identity.

63.     When then-Linda Cummings obtained a legal name change in California to make the stage name "Ramone" her legal last name (long after John Cummings' death in 2004) by simply continuing to use it as her name, it caused, and continues to cause, problems for RPI, confusion to the public in connection with the RPI Trademarks, and dilution of the famous RAMONES Trademark.  As a result, legal restrictions were placed on her concerning her use of her name change to Ramone, in a finding by Arbitrator Donnelly in 2019.

64.     Ms. Cummings-Ramone remains unabashedly obsessed with portraying herself as the widow of Johnny Ramone and an integral "member" of the Ramones band during and after the band's tenure, which of course she was and is not.  She has channeled this obsession

into portraying herself as a social media influencer and purported keeper of the Ramones legacy, engaging with fans of the band, fan clubs, and the general public on a regular basis with the apparent sole authority to represent RPI and the Ramones, which she does not have.

65.     Ms. Cummings-Ramone has made and continues to make blatant attempts to exploit and personally capitalize on and benefit from the name, goodwill and legacy of the Ramones—that is, to try to push the false narrative that she is the heiress to, and is ordained to fully control, the Ramones' legacy.  She most certainly is not.  She is nothing more than a blatant self-promoter and an infringer of the RPI Trademarks and the JOEY RAMONE Mark. She is also diluting the famous RAMONES Mark by reducing consumer perception that it is a unique mark, legitimately used only by RPI and its authorized licensees under agreed terms, thus impairing its distinctiveness, and by tarnishing the RAMONES Mark by undermining and damaging the valuable goodwill associated therewith.

> **i.     Ms. Cummings-Ramone's Relentless and Calculated Efforts to Fashion Herself as a Social Influencer as a Spokesman of the Ramones Band**

66.     In her quest for fame, Ms. Cummings-Ramone uses social media heavily, publicly identifying herself as a social media "influencer" with her own distinctive, commercial brand and status as self-proclaimed "President of the Johnny Ramone Army."

67.     Indeed, Ms. Ramone has registered the mark LINDA RAMONE, which she has alleged that she has used in commerce, with the US. Patent and Trademark Office. She Is the owner of U.S. Reg. No.   for  ..

68.      Ms. Cummings-Ramone regularly and unabashedly litters her public social media pages—including her Instagram page, which she operates under the "public figure" account name "Linda Ramone": https://www.instagram.com/lindaramone/,  her Facebook

page, which she also operates under the "public figure" account name "Linda Ramone": https://www.facebook.com/MrsLindaRamone, and her X (formerly Twitter) page, which she likewise operates under verified account name "Linda Ramone": https://x.com/lindaramone— as well as her website, lindaramone.com, with posts and accompanying hashtags that utilize the RPI Trademarks and JOEY Ramone Trademark without authorization from RPI or Mr. Hyman.

69.     Importantly, the unauthorized posts on these social media accounts have a far-reaching audience, as Ms. Cummings-Ramone's influencer Instagram account currently has 99.3 thousand followers (by contrast, Joey Ramone's Instagram account currently has 55 thousand followers), her Facebook account has 63.5 thousand followers, and her X (formerly Twitter) account has 17.8 thousand followers.

70.     A social influencer is defined as a person who has become well-known through use of the internet and social media, and uses celebrity to endorse, promote, or generate interest in specific products, brands, etc., often for payment. *See Influencer (n.)*, OXFORD ENGLISH DICTIONARY, Oxford UP, September 2023, https://www.oed.com/dictionary /influencer_n?tl=true (last visited June 5, 2024).

71.     As audience mass and credibility is established, social influencers use their influence and celebrity, often in a certain niche or industry, to endorse, promote, or generate interest in specific products, brands, etc., often for trade in kind or payment.

72.     In particular, a social influencer is someone who has:

- "specialized knowledge, authority, and/or insight into a specific subject. Their pre-existing presence in a niche makes them a useful launching pad for brands

in search of credibility."[4]

- "the power to affect the purchasing decisions of others because of his or her authority, knowledge, position, or relationship with his or her  audience" or target audience.[5]

- "a following in a distinct niche, with whom he or she actively engages.  The size of the following depends on the size of his/her topic of the niche."  *Id.*

- "have large followings on one or more social channels, allowing them to influence people, set trends, and affect purchasing decisions."[6]

- "work to generate a form of 'celebrity' capital by cultivating as much attention as possible and crafting an authentic 'personal brand' via social networks."[7]

- invested time, money, and resources to establish direct connections between their professional persona and their targeted following.

73.     "The timeline to become a Social Media Influencer is highly variable…. Some influencers achieve a significant following within a few months by capitalizing on viral content or trending topics, while for others, it may take several years of consistent, strategic content creation and community building."  *See* TEAL HQ, *How to Become a Social Media Influencer,* TEAL LABS, INC. (June 5, 2024),  https://www.tealhq.com/how-to-become/social-media-

---

[4] **sprout**social, Influencer, SPROUT SOCIAL, INC. (June 5, 2024),  https://sproutsocial.com/glossary /influencer/#:~:text=An%20influencer%20is%20someone%20in ,insight%20into%20a%20specific%20subject.

[5] Werner Geyser, What is an Influencer? – Social Media Influencers Defined [Updated 2024], INFLUENCER MARKETING HUB (Feb. 14, 2024), https://influencermarketinghub.com/what-is-an-influencer/.

[6] Shopify Staff, Social Media Influencers: Definition and How To Engage With Them, SHOPIFY (Jun. 16, 2023), https://www.shopify.com/blog/social-media-influencer#.

[7] Gillian Brooks, Jenna Drenten & Mikolaj Jan Pistorski, *Influencer Celebrification: How Social Media Influencers Acquire Celebrity Capital*, JOURNAL OF ADVERTISING, 2021, Vol. 50, No. 5, 528-547 (Nov. 22, 2021), https://www.tandfonline.com/doi/full/10.1080/00913367.2021.1977737 (internal citation omitted).

influencer#:~:text=Some%20influencers%20achieve%20a%20significant,content%20creation
%20and%20community%20building.

74.     Content creators surge past legacy media as news hits a tipping point as consumers are looking for news that 'feels more relevant' giving a boost to creators on social media. *See, e.g.*, Taylor Lorenz, *Content creators surge past legacy media as news hits a tipping point*, THE WASHINGTON POST (Oct. 31, 2023 at 6:00 a.m. EDT), https://www.washingtonpost.com/technology/2023/10/31/creator-economy-news-outlets-influencers/.   Influencers in social media are people who have built a reputation for their viewpoint, knowledge, and expertise on a specific topic. *See, e.g.*, Geyser, *supra*.  They tend to have an aspirational draw and can help brands boost visibility and awareness among large groups of consumers and may have their own websites or merchandise.  *See, e.g.*, Dennis Ortiz & Kenny Gold, *What's the Difference Between Creators and Influencers?*, THE WALL STREET JOURNAL (CMO TODAY | CONTENT BY DELOITTE) (Mar. 5, 2024), https://deloitte.wsj.com/cmo/whats-the-difference-between-creators-and-influencers-f68c026c.  They focus their content on lifestyle, promoting products, portraying a certain image, or engaging the audience to continue to grow their influence.  Examples of popular influencer niches categories include home, beauty, fashion and music.  *See, e.g.*, Kiril Damaski, *Influencers Club Blog: Kiril Dameski*, https://influencers.club/blog/top-micro-influencers/.

75.     The current number of followers on Ms. Cummings-Ramone's social media channels qualifies her as a mid-tier influencer.  *See, e.g.*, Rob Sanders, *The 5 Types of Influencers You Need to Know*, SIMPLILEARN (Feb. 16, 2024), https://www.simplilearn.com/types-of-influencers-article#:~:text=audience%20and%20goals.
-,Mid%2DTier%20Influencers,influencer%20to%20mid%2Dtier%20influencer.

76.     Ms. Cummings-Ramone—who, again, goes by "Linda Ramone" in her social media—has built her social media presence and established herself as a social media influencer through unauthorized use of both the RPI Trademarks and the JOEY RAMONE Mark, and continues to do so.

  ii.  **Ms. Cummings-Ramone's Specific Misconduct Giving Rise to the Instant Action**

77.     As set forth above, the 2005 Shareholders' Agreement, 2009 Settlement Agreement, and 2019 Final Award establish that social media influencer Ms. Cummings-Ramone: (1) does not have the right to individually exploit the RPI Trademarks without unanimous consent of the Board of Directors; (2) does not have the right to individually exploit the name "Joey Ramone"; (3) does not have the right to utilize the name "Linda Ramone" in connection with products or other materials released by RPI; and (4) does not have the right to utilize the name "Linda Ramone" in connection with the Johnny Ramone Tribute event if the RPI's intellectual property is also used in connection with the event.  Despite the foregoing, Ms. Cummings-Ramone regularly and unabashedly fills her public social media pages and personal website with unauthorized posts and accompanying hashtags that violate the four (4) tenets set forth above.  Further, Ms. Cummings-Ramone frequently engages in self-promotional efforts, including widely disseminated interviews with various media outlets, which utilize identical and/or confusingly similar versions of the RPI Trademarks and the JOEY RAMONE Mark.  In addition, she has entered unauthorized brand deals from which she derives personal income from unauthorized use of the identical and/or confusingly similar versions of the RPI Trademarks.

  a.  **Self-Serving Social Media Behavior**

78.     Ms. Cummings-Ramone's selfish, harmful social media activity has obstructed

various RPI income opportunities and has actually put RPI at significant risk of financial and reputational harm.  It has also stripped Mr. Hyman of his ability to control commercial use of the JOEY RAMONE Mark.

79.     Indeed, attached hereto as **Exhibit "O"** are examples of Ms. Cummings-Ramone's unauthorized commercial exploitations of identical and/or confusingly similar versions of the RPI Trademarks and the JOEY RAMONE Mark in connection with the name "Linda Ramone," each of which is clearly intended to garner public attention, build Ms. Cummings-Ramone's individual brand, and, ultimately, to generate income for Ms. Cummings-Ramone.

80.     This includes, without limitation, income associated with the Johnny Ramone Tribute event that features the RPI Trademarks and other RPI intellectual property.  A link for purchasing tickets to this event is featured prominently at the top of Ms. Cummings-Ramone's "Linda Ramone" Instagram page and on her personal www.lindaramone.com webpage (as shown below, respectively), in direct violation of the 2019 Arbitration Award:





81.     As pointed out by the Arbitrator in his Final Award, Defendant's use of the name "Linda Ramone" alongside the RPI Trademarks is likely to confuse consumers into thinking that Defendant has carte blanche rights to use the RPI Trademarks and that she *is*, in fact, an integral part of the Ramones band. Ex. N at p. 42. This is, of course, untrue – and it constitutes trademark infringement, trademark dilution, and unfair competition.

82.     In fact, Ms. Cummings-Ramone often promotes herself on social media as essentially being a member of the Ramones band, which is no more obvious than in the drawing of herself squarely in the midst of the band that she commissioned an artist to create and then posted on her social media:



83.     Further, in her ongoing effort to declare herself the only face of the Ramones,

Ms. Cummings-Ramone, because of her position in RPI, is aware of the company social media

calendar and immediately comments on postings in attempt to promote herself personally and

to appear, to members of the public, to have complete control over all Ramones-related content, including the RPI Trademarks.

84.     In addition, in 2022, Ms. Cummings-Ramone misused the trademarked, iconic Morton Salt "Umbrella Girl" illustration, which is owned by Morton Salt, Inc. (hereinafter, the "Umbrella Girl Mark").

85.     Despite the fact that neither Ms. Cummings-Ramone nor RPI have rights to the Umbrella Girl Mark, Ms. Cummings-Ramone posted a near replica of the Umbrella Girl Mark on her Facebook page to promote herself, modifying the illustration to feature the name "Linda Ramone" alongside several RPI Trademarks (which she uses without authorization), including the GABBA GABBA HEY Mark and the RAMONES Mark, as shown below:



86.     Indeed, Ms. Cummings-Ramone had no right to use the RPI Trademarks in this fashion.

87.     Needless to say, Ms. Cummings-Ramone's self-serving and self-aggrandizing social media behavior has caused severe damage to RPI and Mr. Hyman.

### b.     The Interviews

88.     In addition, in manifest breach of the 2005 Shareholders' Agreement and 2009 Settlement Agreement, and in violation of RPI's and Mr. Hyman's intellectual property rights, Ms. Cummings-Ramone has appeared on a number of podcasts, and in video and print interviews for which she was compensated (collectively, the "Interviews"), utilizing the RPI Trademarks to discuss the history of the Ramones and the present-day business of RPI related to the band.  She frequently does so under the name "Linda Ramone."

89.     The Interviews include, without limitation: (1) an episode of *The Dummy Room* podcast first published in or around May 2022 entitled "The Dummy Room #107 – Linda Ramone"; (2) an episode of the *Muses* podcast first published in or around April 2020 entitled "Interview with Linda Ramone"; (3) a one-hour interview on the YouTube channel "Warren Brown – The Beatles Kingdom" first published in or around March 2020 entitled "Tomorrow Never Knows with Special Guest Linda Ramone"; and (4) a 2-part video interview on the Youtube Channel "Erin Micklow" first published in or about October 2018, with the first part bearing the title "Linda Ramone: Inside Ramones Ranch + Johnny Ramone Tribute."

90.     Additionally, in certain of the Interviews, Ms. Cummings-Ramone and the interviewer(s) are located in the Los Angeles home that Ms. Cummings-Ramone shared with her late husband, which she refers to as the "Ramones Ranch."  Again, this is in manifest breach

of the 2005 Shareholders' Agreement and 2009 Settlement Agreement, and in violation of RPI's Intellectual Property rights.  It was also specifically prohibited by the Final Award.

91.     To be clear, Ms. Cummings-Ramone's use of the name "Linda Ramone" and her description of her home as the "Ramones Ranch" during certain of the Interviews was designed and intended by Ms. Cummings-Ramone to create the impression in listeners and readers—including potential business counterparties to RPI—that she possesses exclusive knowledge concerning the history of the Ramones and to provide a false imprimatur of power and authority in Ms. Cummings-Ramone concerning the legacy of the Ramones and RPI's business dealings.

92.     In the aggregate, Ms. Cummings-Ramone presents herself to the world as "Linda Ramone" and unilaterally adopts the mantle of designated Ramones spokesperson and "keeper of the legacy."  She intentionally gives the false impression that she is empowered to take the lead on, or unilaterally pursue, Ramones business, and to use the RPI intellectual property, falsely stating, "I don't need permission or anything"; asserting, "I do Ramones business"; and purporting to unilaterally "keep the legacy alive."  For the avoidance of doubt, Ms. Cummings-Ramone has engaged and currently engages in these efforts for purposes of promoting her "Linda Ramone" social media influencer brand.

### c.     Happy Socks

93.     Further to all of the above-referenced abhorrent conduct, Ms. Cummings-Ramone has also entered, without requisite authorization from Plaintiff, various brand deals which violate RPI's intellectual property rights.

94.     For example, in January of 2020, *Happy Socks*, a Swedish manufacturer and retailer of socks, underwear, and swimwear, launched a sock collection ultimately described by

Ms. Cummings-Ramone through the "Johnny Ramone" verified Instagram account as "inspired by Johnny & Linda Ramone's Punk Rock love story."  This merchandizing opportunity and collaboration between Ms. Cummings-Ramone on one hand, and Happy Socks on the other hand, was never brought before RPI's Board of Directors.  Nor was it approved by Plaintiff in any other manner whatsoever.

95.    Notably, in an article published on the JohnnyRamone.com website,[8] the HEY HO! LET'S GO Mark that is owned and controlled by RPI is used in connection with promoting the aforementioned collaboration.  The article also promotes a "Mad Sock Party" at the "Johnny and Linda Ramone Ranch" and the Eveleigh in Los Angeles, specifically noting that Mr. J.D. King, Ms. Cummings-Ramone's current significant other, was featured at the event.

96.    Ms. Cummings-Ramone's decision to take this opportunity away from RPI for her own personal gain was a significant violation of RPI's intellectual property rights.  Indeed, instead of acting on behalf of RPI, Ms. Cummings-Ramone has repeatedly seized corporate opportunities for herself, to promote her significant other, and otherwise build her own "Linda Ramone" brand to the detriment of RPI and Mr. Hyman.

**F.    Demand On RPI's Board of Directors Prior To Initiating Derivative Claims Against Ms. Cummings-Ramone For Her Misuse of the RPI Trademarks Would Have Been Futile Under N.Y. Bus. Corp. Law § 626(c) (McKinney)**

97.    As set forth above, Mr. Hyman is a 50% owner of RPI, a domestic corporation, thereby satisfying the requirement of N.Y. Bus. Corp. Law § 626(a) (McKinney) for purposes of a shareholders' derivative action being brought in the right of the corporation to procure judgment in its favor, as and for the claims asserted derivatively against Defendant.

---

[8] https://www.johnnyramone.com/features/happysocks (last visited June 5, 2024).

98.     As also set forth above, and in accordance with N.Y. Bus. Corp. Law § 626(b) (McKinney), Mr. Hyman was such a holder of said 50% interest in RPI at the time of bringing these claims, and was and has been such holder of shares at the times of the transactions of which he complains.

99.     Pursuant to N.Y. Bus. Corp. Law § 626(c) (McKinney), any effort by Mr. Hyman to secure the initiation of such claims against Defendant would have been futile.

100.    Indeed, Mr. Hyman and his "Designated Director" under RPI's Shareholders' Agreement, Mr. Frey (collectively, the "Hyman Directors"), represent half of the Company's Board of Directors, and they have represented half of the Company's Board of Directors, at all times relevant hereto.  At all times relevant hereto, and with respect to the matters complained of herein, both Hyman Directors have voted at the direction of Mr. Hyman.

101.    Ms. Cummings-Ramone and her currently purported "Designated Director" under RPI's Shareholders' Agreement, Mr. Zonshine (collectively, the "Cummings Directors") represent the remainder of the Company's Board of Directors, and they have represented half of the Company's Board of Directors, at all times relevant hereto.  At all times relevant hereto, and with respect to the matters complained of herein, both Cummings Directors have voted at the direction of Ms. Cummings-Ramone.

102.    The Cummings Directors have and continue to put the interests of Ms. Cummings-Ramone ahead of the interests of RPI.

103.    Accordingly, had Mr. Hyman made a demand to initiate the below derivative claims, such demand would have been futile.

**COUNT I**
**TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION**
**UNDER THE LANHAM ACT, 15 U.S.C. §§ 1114 and 1125(a)**

*Mr. Hyman, derivatively on behalf of RPI, Inc., vs. Ms. Cummings-Ramone – with respect to RPI Trademarks*
*Mr. Hyman v. Ms. Cummings-Ramone – with respect to the JOEY RAMONE Mark*

104.    Plaintiff repeats and re-alleges each and every allegation of Paragraphs 1 through 103 as though fully set forth herein.

105.    RPI is the owner of the valid and protectable rights in the RPI Trademarks. Likewise, Mr. Hyman is the owner of the valid and protectable rights in the JOEY RAMONE Mark.

106.    Members of the consuming public have come to associate the RPI Trademarks with RPI and/or its predecessors and authorized licensees; RPI owns valuable goodwill symbolized by the RPI Trademarks.  Likewise, members of the consuming public have come to associate the JOEY RAMONE Mark with Mr. Hyman and/or his predecessors and authorized licensees; Mr. Hyman owns valuable goodwill symbolized by the JOEY RAMONE Mark.

107.    RPI's rights in the RPI Trademarks, which RPI and/or its predecessors and authorized licensees have continuously used in commerce throughout the United States for many years, predate Defendant's unauthorized and infringing use of identical and/or confusingly similar versions of the RPI Trademarks.  Likewise, Mr. Hyman's rights in the JOEY RAMONE Mark, which Mr. Hyman and/or his predecessors and authorized licensees have continuously used in commerce throughout the United States for many years, predate Defendant's unauthorized and infringing use of identical and/or confusingly similar versions of the JOEY RAMONE Mark.

108.    Defendant is attempting to merchandise the RPI Trademarks and JOEY RAMONE Mark for her sole benefit and without authorization. *See, e.g.*, Ex. O hereto.

109.    Defendant's unauthorized use of the RPI Trademarks and the JOEY RAMONE Mark has caused confusion and mistake, and is likely to continue to cause confusion, cause mistake, and/or deceive as to the affiliation, connection, or association of Plaintiff with RPI (and/or its predecessors and authorized licensees) and Mr. Hyman (and/or his predecessors and authorized licensees), or as to the origin, sponsorship, or approval of Defendant's services or goods, in violation of the Lanham Act.  Persons familiar with RPI (and/or its predecessors and authorized licensees) and Mr. Hyman (and/or his predecessors and authorized licensees)  are likely to mistakenly believe that Defendant's activities and merchandise are under the sponsorship of, or in affiliation with RPI and/or Mr. Hyman—which they are not.

110.    Defendant's unauthorized use in commerce of the RPI Trademarks and JOEY RAMONE Mark for her own benefit constitutes trademark infringement and unfair competition under the Lanham Act.

111.    By reason of Defendant's acts as alleged above, RPI and Mr. Hyman have suffered and will continue to suffer damage and injury to their businesses and reputations, along with losses of revenue and profits, as the infringing and impermissible use of the RPI Trademarks and JOEY RAMONE Mark is still visible on numerous online social media platforms and Ms. Cummings-Ramone's website.

112.    Defendant's aforesaid acts are greatly and irreparably damaging to RPI and Mr. Hyman, and they will continue to irreparably damage RPI and Mr. Hyman unless enjoined by this Court; indeed, RPI and Mr. Hyman are without adequate remedy at law.

113.   Furthermore, RPI and Mr. Hyman are entitled to heightened monetary damages, along with attorneys' fees and costs, resulting from Defendant's intentional wrongdoing.

**COUNT II**
**COMMON LAW TRADEMARK INFRINGEMENT**
**AND UNFAIR COMPETITION**

*Mr. Hyman, derivatively on behalf of RPI, Inc., vs. Ms. Cummings-Ramone – with respect to RPI Trademarks*
*Mr. Hyman v. Ms. Cummings-Ramone – with respect to the JOEY RAMONE Mark*

114.   Plaintiff repeats and re-alleges each and every allegation of Paragraphs 1 through 103 as though fully set forth herein.

115.   RPI is the owner of the valid and protectable rights in the RPI Trademarks. Likewise, Mr. Hyman is the owner of the valid and protectable rights in the JOEY RAMONE Mark.

116.   Members of the consuming public have come to associate the RPI Trademarks with RPI and/or its predecessors and authorized licensees; RPI owns valuable goodwill symbolized by the RPI Trademarks.  Likewise, members of the consuming public have come to associate the JOEY RAMONE Mark with Mr. Hyman and/or his predecessors and authorized licensees; Mr. Hyman owns valuable goodwill symbolized by the JOEY RAMONE Mark.

117.   RPI's rights in the RPI Trademarks, which RPI and/or its predecessors and authorized licensees have continuously used in commerce throughout the United States for many years, predate Defendant's unauthorized and infringing use of identical and/or confusingly similar versions of the RPI Trademarks.  Likewise, Mr. Hyman's rights in the JOEY RAMONE Mark, which Mr. Hyman and/or his predecessors and authorized licensees have continuously used in commerce throughout the United States for many years, predate

Defendant's unauthorized and infringing use of identical and/or confusingly similar versions of the JOEY RAMONE Mark.

118. Defendant is attempting to merchandise the RPI Trademarks and JOEY RAMONE Mark for her sole benefit and without authorization. *See, e.g.*, Ex. O hereto.

119. Defendant's unauthorized use of the RPI Trademarks and the JOEY RAMONE Mark has caused confusion and mistake, and is likely to continue to cause confusion, cause mistake, and/or deceive as to the affiliation, connection, or association of Plaintiff with RPI (and/or its predecessors and authorized licensees) and Mr. Hyman (and/or his predecessors and authorized licensees), or as to the origin, sponsorship, or approval of Defendant's services or goods, in violation of New York Common Law. Persons familiar with RPI (and/or its predecessors and authorized licensees) and Mr. Hyman (and/or his predecessors and authorized licensees) are likely to mistakenly believe that Defendant's activities and merchandise are under the sponsorship of, or in affiliation with RPI and/or Mr. Hyman.

120. Defendant's unauthorized use in commerce of the RPI Trademarks and JOEY RAMONE Mark for her own benefit constitutes trademark infringement and unfair competition in violation of the common law of the State of New York.

121. By reason of Defendant's acts as alleged above, RPI and Mr. Hyman have suffered and will continue to suffer damage and injury to their businesses and reputations, along with losses of revenue and profits, as the infringing and impermissible use of the RPI Trademarks and JOEY RAMONE Mark is still visible on numerous online social media platforms and Ms. Cummings-Ramone's website.

122.   Defendant's aforesaid acts are greatly and irreparably damaging to RPI and Mr. Hyman, and they will continue to irreparably damage RPI and Mr. Hyman unless enjoined by this Court; indeed, RPI and Mr. Hyman are without adequate remedy at law.

123.   Furthermore, RPI and Mr. Hyman are entitled to heightened monetary damages, along with attorneys' fees and costs, resulting from Defendant's intentional wrongdoing.

## COUNT III
## FEDERAL TRADEMARK DILUTION
## UNDER THE LANHAM ACT, 15 U.S.C. § 1125(c)

### *Mr. Hyman, derivatively on behalf of RPI, Inc., vs. Ms. Cummings-Ramone*

124.   Plaintiff repeats and re-alleges each and every allegation of Paragraphs 1 through 103 as though fully set forth herein.

125.   RPI's RAMONES Mark is distinctive and a "famous mark" within the meaning of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

126.   RPI's RAMONES Mark became distinctive and famous prior to the Defendant's acts as alleged herein.

127.   Defendant's acts as alleged herein have diluted and will, unless enjoined, continue to dilute and are likely to dilute the distinctive quality of RPI's famous RAMONES Mark.

128.   Defendant's acts as alleged herein have tarnished and will, unless enjoined, continue to tarnish, and are likely to tarnish RPI's RAMONES Mark by undermining and damaging the valuable goodwill associated therewith.

129.   Defendant's acts as alleged herein are intentional and willful in violation of Section 43(c)(1) of the Lanham Act, and have already caused RPI irreparable damage and will, unless enjoined, continue to so damage RPI, which has no adequate remedy at law.

130.    RPI is entitled to, among other relief, an award of actual damages, Defendant's profits, enhanced damages and profits, reasonable attorneys' fees, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116 and 1117, together with prejudgment and post-judgment interest.

### COUNT IV
### BREACH OF CONTRACT

***Mr. Hyman, derivatively on behalf of RPI, Inc., vs. Ms. Cummings-Ramone, individually and as a Trustee for the LCR Trusts***

131.    Plaintiff repeats and re-alleges each and every allegation of Paragraphs 1 through 103 as though fully set forth herein.

132.    The 2005 Shareholders' Agreement is a duly executed, valid contract, entered into for good and valuable consideration, governed by the laws of the State of New York, which binds Mr. Hyman and Ms. Cummings-Ramone.  Likewise, the 2009 Settlement Agreement is a duly executed, valid contract, entered into for good and valuable consideration, governed by the laws of the State of New York, which binds Mr. Hyman and Ms. Cummings-Ramone.

133.    As set forth above, the 2005 Shareholders' Agreement and 2009 Settlement Agreement establish that social media influencer Ms. Cummings-Ramone: (1) does not have the right to individually exploit the Ramones intellectual property without unanimous consent of the Board of Directors; (2) does not have the right to individually exploit the name "Joey Ramone"; (3) does not have the right to utilize the name "Linda Ramone" in connection with products or other materials released by RPI; and (4) does not have the right to utilize the name "Linda Ramone" in connection with the Johnny Ramone Tribute event if the Ramones intellectual property is also used in connection with the event.

134.    Mr. Hyman and RPI have fully performed all obligations set forth in the 2005 Shareholders' Agreement and 2009 Settlement Agreement.

135.    In stark contrast, Ms. Cummings-Ramone Hyman has repeatedly violated the four (4) tenets stated in Paragraph 133; she has therefore breached both the 2005 Shareholders' Agreement and 2009 Settlement Agreement.

136.    Consistent therewith, Mr. Hyman, derivatively on behalf of RPI, seeks and is entitled to judgment in favor of RPI in the form of monetary damages resulting from Ms. Cummings-Ramone's breaches of the 2005 Shareholders' Agreement and 2009 Settlement Agreement, in an amount to be determined at trial.

137.    Furthermore, because monetary damages are insufficient to fully address the harm to RPI that has resulted and will continue to result from Ms. Cummings-Ramone's breaches of the 2005 Shareholders' Agreement and 2009 Settlement Agreement, Mr. Hyman also seeks injunctive relief, prohibiting Ms. Cummings-Ramone from further violating the four (4) tenets set forth in Paragraph 133 above.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for a judgment in its favor and against Defendant on its claims set forth in Counts I-IV, and requests the following relief:

1.      Entry of a permanent injunction prohibiting Defendant, her employees, agents, attorneys and all persons acting in concert, participation or combination with Defendant from imitating, copying, registering or making unauthorized use of the RPI Trademarks, the JOEY RAMONE Mark, and confusingly similar variations thereof;

2.     Entry of a permanent injunction prohibiting Defendant, her employees, agents, attorneys and all persons acting in concert, participation or combination with Defendant from engaging in other activity constituting unfair competition with RPI and/or Mr. Hyman;

3.     An award of monetary damages, including disgorgement of Defendant's profits, to compensate RPI and Mr. Hyman for Defendant's infringement of RPI's Trademarks and the JOEY RAMONE Mark, dilution of the RAMONES Mark, unfair competition, and breach of the 2005 Shareholders Agreement and 2009 Settlement Agreement in an amount to be determined at trial, but under no circumstances less than $75,000;

4.     An award of pre-judgment and post-judgment interest;

5.     An award of enhanced damages based on Defendant's willful infringement and unfair competition;

6.     An award of Plaintiff's reasonable attorneys' fees and costs as permitted by law; and

7.     Such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby requests a trial by jury of any and all issues so triable.

Respectfully submitted,

**ROYER COOPER COHEN BRAUNFELD LLC**

Dated: August 23, 2024          By:   /s/  Donna A. Tobin

40

Donna A. Tobin, Esquire
1120 Avenue of the Americas, 4th Fl.
New York, NY 10036-6700
Tel: (212) 994-0454
Email: dtobin@rccblaw.com

*Attorneys for Plaintiff, MITCHEL HYMAN, individually and derivatively on behalf of Ramones Productions, Inc.*