# EXHIBIT B

## AMENDED AND RESTATED
## SHAREHOLDERS' AGREEMENT

AMENDED AND RESTATED SHAREHOLDERS' AGREEMENT (the "Agreement"), dated as of April ___, 2005, by and among Ramones Productions, Inc., a New York corporation (the "Company"), the Estate of Jeffrey Hyman p/k/a Joey Ramone ("Estate of Hyman"), c/o Silent Partner Management, 134 W. 26ᵗʰ Street, Suite 607, New York, NY 10001 and Pryor Cashman Sherman & Flynn LLP, 410 Park Avenue, New York, NY 10022, Attn: Brad D. Rose, Esq., and the John Family Trust of 1997, u/d/t 2/12/97, Linda Cummings, Trustee ("Estate of Cummings"), c/o Linda Cummings, 2934-1/2 Beverly Glen Circle, #423, Los Angeles, CA 90077 and Jeffrey Light, Esq., Myman Abell Fineman Greenspan & Light, 11601 Wilshire Blvd., #2200, Los Angeles, CA 90025  (Estate of Hyman and Estate of Cummings each, a "Shareholder" and collectively, the "Shareholders").  This Agreement amends and restates the Original Agreement (defined below) in its entirety.

## W I T N E S S E T H:

WHEREAS, the Company, which was incorporated in 1978, is the vehicle through which the musical group, the Ramones (the "Ramones") markets, merchandises, licenses and produces its memorabilia and musical-related products;

WHEREAS, the Company is authorized to issue 200 shares of common stock, no par value per share (the "Shares"), of which 200 shares are currently issued and outstanding;

WHEREAS, each Shareholder is the record and beneficial owner of the number of Shares appearing opposite his name on Schedule 1 to this Agreement, free and clear of all options, liens, encumbrances or charges of any kind except as set forth in this Agreement;

WHEREAS, Charlotte Lesher ("Lesher") and Mitchell Hyman ("Mitchell Hyman") are the representatives of the Estate of Hyman and shall act on its behalf;

WHEREAS, the Company, Lesher and Mitchell Hyman on behalf of the Estate of Hyman and John Cummings previously entered into a Shareholders' Agreement, dated as of October, 2002 (the "Original Agreement");

WHEREAS, John Cummings died in 2004 and Linda Cummings (or any duly appointed representative thereof, "Linda Cummings") has represented and warranted to the Company and the Estate of Hyman that she is the sole legal representative of the Estate of Cummings and is authorized to act on its behalf;

WHEREAS, a dispute has arisen between the Estate of Hyman and the Estate of Cummings regarding the Original Agreement with respect to the rights of the Estate of Hyman to

294936v10

purchase the Shares formerly owned by John Cummings and the valuation of such Shares;

WHEREAS, the Estate of Hyman filed an arbitration proceeding (the "Arbitration") with respect to such dispute;

WHEREAS, the parties desire to amicably resolve all such disputes and to amend and restate the Original Agreement in this Agreement; and

WHEREAS, the parties deem it in the best interests of the Company to provide for continuity in the control and operation of the Company, and to restrict the transfer of the Shares of the Company held by the Shareholders;

NOW, THEREFORE, in consideration of the premises and the mutual agreements and covenants contained herein, the parties hereto agree as follows:

1.      Election and Removal of Directors: Actions by the Board of Directors.

(a)      General. The Company, to the extent possible, and each of the Shareholders agree to take such action as may be necessary to cause the board of directors of the Company (the "Board of Directors"), to be elected in accordance with the provisions of this Section 1.  In furtherance, and not in limitation, of the foregoing, each Shareholder shall vote or cause to be voted, whether at any annual or special meeting of Shareholders of the Company called for the purpose of electing or removing directors or pursuant to a written consent in lieu thereof, all voting shares of the capital stock of the Company (the "Voting Shares") then owned or controlled by such Shareholder in favor of the election of directors designated for election in accordance with Section 1(b) or 1(d), as applicable.  As necessary, the Shareholders shall take all action to effectuate the election of each person designated for election to the Board of Directors in accordance with Section 1(b) or 1(d), as applicable, and shall include in any proxy solicitation materials related to the election of members of the Board of Directors all such information and recommendations of the Board of Directors as may be necessary or advisable to cause the persons so designated to be elected to the Board of Directors.  The Company and each Shareholder shall take all other actions necessary to ensure that the certificate of incorporation and bylaws of the Company as in effect immediately following the date hereof do not, at any time thereafter, conflict in any respect with the provisions of this Agreement.

(b)      Election of Designated Directors.

(i)      Each of the Shareholders shall vote all Voting Shares owned or controlled by such Shareholder in favor of causing the Board of Directors to consist of four directors, including Mitchell Hyman and Linda Cummings and two other directors, who shall be designated in accordance with subparagraph (ii) below.

(ii)      Mitchell Hyman and Lesher, on the one hand, and Linda Cummings, on the other hand, shall each have the right to designate one additional person to serve with him or her as a director on the Board of Directors (Mitchell Hyman and the director designated by

294936v10                                             2

Mitchell Hyman and Lesher, each a "Hyman Director" and together, the "Hyman Directors" and Linda Cummings and the director designated by Linda Cummings, each a "Cummings Director" and together, the "Cummings Directors").

(c)     Removal.  Mitchell Hyman and Lesher shall be entitled at any time and for any reason (or for no reason) to require the removal of the designated Hyman Director and Linda Cummings shall be entitled at any time and for any reason (or for no reason) to require the removal of the Cummings Director.  Linda Cummings hereby agrees to remove Gary Kurfirst ("Kurfirst") as a Cummings Director, effective immediately, and that Kurfirst shall not be subsequently reappointed or eligible to serve as a director of the Company.  Linda Cummings hereby appoints Rob Zombie in Kurfirst's place as the second Cummings Director.  The Shareholders agree that Kurfirst shall have no authority to act as an officer, director or manager of the Company or in any capacity on behalf of the Company or the Ramones.  It is understood, however, that Linda Cummings may retain Kurfirst to act as her personal representative or as a representative of the Estate of Cummings.  It is further understood, however, that Linda Cummings shall cause Kurfirst to promptly direct all business matters and opportunities related to the Company or the Ramones that come to his attention in such capacity to the Board of Directors of the Company.

(d)     Filling Vacancies.  If at any time a vacancy is created on the Board of Directors by reason of the death, removal or resignation of either a Hyman Director or a Cummings Director (a "Removed Director"), subject to subparagraphs (i) and (ii) below, the remaining Hyman or Cummings Director, as the case may be, shall have the right to designate a replacement director to fill such vacancy and the Shareholders shall take such action to approve and elect, within twenty (20) days after designation, the director so designated.

(i)     If a vacancy is created by reason of the death, removal or resignation of either of the Hyman Directors, the remaining Hyman Director shall have the sole right to designate a nominee to be elected to fill such vacancy until the next annual meeting of the Shareholders of the Company.

(ii)     If a vacancy is created by reason of the death, removal or resignation of either of the Cummings Directors, the remaining Cummings Director shall have the sole right to designate a nominee to be elected to fill such vacancy until the next annual meeting of the Shareholders of the Company.

(e)     Actions by the Board.  Unless otherwise specified, all actions of the Company shall be subject to the approval of a majority of the Board of Directors; provided, however, that the Company may not take any action with regard to the following, without the affirmative vote, or written consent, of all of the members of the Board of Directors of the Company:

(i)     any amendment to the Company's certificate of incorporation or by-laws;

(ii)     any change in the number of directors of the Company;

(iii)   any change in the Company's capital structure;

(iv)   any action to incur corporate debt;

(v)   any capital expenditure;

(vi)   any redemption or repurchase of the Company's stock;

(vii)   any issuance of shares of capital stock or rights to acquire the same;

(viii)   any merger or consolidation of the Company into another entity or any sale of all or substantially all of the Company's assets;

(ix)   any dissolution, liquidation or winding up of the Company;

(x)   any payment of dividends by the Company; or

(xi)   any change in the strategic direction of the Company.

(f)   Deadlock. If as to any Company or Shareholder action or matter requiring approval, authorization or other action by the Shareholders or the Board of Directors pursuant to this Agreement or by law is not able to be taken or obtained by reason of a dispute between the Shareholders or the absence of a majority decision by the Shareholders or the Board of Directors (a "Deadlock Event"), then the Shareholders shall proceed to negotiate in good faith, and shall use their reasonable efforts, to resolve such Deadlock Event for a period of ten (10) days after notice from any Shareholder of the existence of a Deadlock Event. While any Deadlock Event is pending, the Company and the Shareholders and officers and directors shall continue to operate the Company and its business without interruption in the manner most closely to the ordinary course consistent with past practice. In the event that the Deadlock Event is not resolved within such ten (10) day period, the dispute relating to the Deadlock Event shall be submitted to a mediator, to be selected by the Directors on a case by case basis (the "Mediator") for final and binding mediation. If the Mediator is unable or unwilling to serve or the Directors are unable to agree upon a mediator, the Estate of Hyman on the one hand, and the Estate of Cummings on the other hand shall each select a substitute mediator who shall then select a third party to act as Mediator. The expenses of the Mediator shall be borne by the Company and any decision of the Mediator shall be final and binding upon the parties.

2.   Officers.

(a)   The Board of Directors may appoint any person to act as an officer on behalf of the Company and may grant to any such person such power and authority over the business and affairs of the Company as the Board of Directors shall determine in its sole and absolute discretion. The Board of Directors hereby appoints the following persons to the offices set forth opposite their names to serve at the pleasure of, and to perform the duties to be specified by, the Board of Directors until their successors shall be elected or appointed and duly qualified:

| NAME | OFFICE |
|---|---|
| Charlotte Lesher | Chief Executive Officer |
| Linda Cummings | President |
| Ira Herzog | Vice President-Finance |

(b)      *Actions by the Officers.*  Subject only to the provisions of Section 1(e), Lesher, Linda Cummings and Ira Herzog, as officers of the Company, shall have the authority to manage the daily affairs of the Company and to make all day-to-day decisions and handle all matters on behalf of the Company.

3.      Restrictions on Transfer.

(a)      *General Restrictions.*  During the term of this Agreement, none of the Shares now owned or hereafter acquired by any of the Shareholders may be sold, assigned, transferred, pledged, hypothecated, given away or in any other manner disposed of or encumbered, except as follows:

(i)      such transfer of Shares shall be in accordance with the requirements of this Agreement;

(ii)      the proposed recipient of such Shares shall deliver to the Company a written acknowledgement and representation, in form and substance reasonably satisfactory to the Company and its counsel, that the Shares to be received in such proposed transfer are subject to this Agreement and the proposed recipient and his successors in interest are bound hereby; and

(iii)      such transfer shall be made pursuant to an effective registration under the Securities Act of 1933, as amended (the "Securities Act"), or an exemption from such registration, and in compliance with all applicable state securities or "blue sky" laws and prior to any such transfer the Shareholder proposing to transfer Shares shall give the Company (A) five (5) days' prior written notice describing the manner and circumstances of the proposed transfer and (B) if requested by the Company, a written opinion of legal counsel who shall be reasonably satisfactory to the Company and its counsel, such opinion to be in form and substance reasonably satisfactory to the Company and its counsel, to the effect that the proposed transfer of Shares may be effected without registration under the Securities Act and in compliance with applicable state securities laws.

Any attempted transfer of Shares other than in accordance with this Agreement shall be null and void and the Company shall refuse to recognize any such transfer and shall not reflect on its records any change in record ownership of Shares pursuant to any such attempted transfer.

(b)      *Transfers.*  The closing of any transfer of Shares shall take place at the offices of the Company unless otherwise provided in this Agreement or mutually agreed by the parties involved in the transfer. Any Shareholder that transfers Shares shall (i) do all things and execute and deliver all such papers as may be necessary or reasonably requested by the Company in order to consummate the transfer of such Shares and (ii) pay to the Company such amounts as may be required for any applicable stock transfer taxes and any expenses incurred by the Company in connection with such transfer (including reasonable attorneys' fees).

4.      Permitted Transfers of Shares.  Subject to the provisions of Section 3 of this Agreement and the provisions of this Section, any Shareholder may transfer any or all of his respective

Shares only upon compliance with the following terms and conditions:

(a)     Shareholder Transfers.  Any Shareholder may transfer (such Shareholder to be hereinafter referred to as the "Transferor") any or all of his Shares only as follows:

(i)     to the Company or any Affiliate of the Company as that term is defined in Rule 12b-2 promulgated under the Securities Exchange Act of 1934, as amended; and

(ii)     if the Option triggered under Section 5 is not exercised, to any person or entity by will or in accordance with the applicable laws of descent and distribution.

(b)     Transferee Restrictions.  Any person or entity who is not a Shareholder as of the date hereof who acquires Shares pursuant to this Section shall comply with Section 3(a)(ii) hereof and shall become a "Shareholder" for purposes of this Agreement.  Such Shareholder shall be deemed to be a member of the same Shareholder group (the Hyman Group or the Cummings Group, as the case may be, and each, a "Shareholder Group") as that of the Transferor and shall be bound by all the provisions of this Agreement.

(c)     Pledge or Hypothecation.  No Shareholder may pledge, hypothecate or encumber his Shares.

5.     Death of a Shareholder.

(a)     Option.  Upon the death of Linda Cummings with respect to the Shares owned by the Estate of Cummings, on the one hand, or the death of both Lesher and Mitchell Hyman with respect to the Shares owned by the Estate of Hyman, on the other hand, such Shareholder's legal representative shall be required immediately to offer, and shall be deemed to offer, for sale all the Shares owned by such Shareholder (the "Available Shares") to the other Shareholders and the Company in accordance with this Section 5.  Such other Shareholders and the Company shall have options to purchase any or all of the Available Shares at an exercise price equal to the then fair market value of such Shares as determined pursuant to Section 5(c) hereof (the "Option").

(b)     Exercise.

(i)     The Option shall be exercisable in such order of priority and during such periods as provided in Section 5(e) below.

(ii)     If the other Shareholders and the Company shall elect to purchase fewer than all of the Available Shares pursuant to this subparagraph 5(b), the legal representative for the Available Shares shall have the option of either (A) proceeding with the sale of the Available Shares which the other Shareholders and the Company shall have elected to purchase, or (B) retaining all of the Available Shares.

(c)     Exercise Price.  The exercise price payable for each Share to be purchased upon exercise of the Option shall be the fair market value thereof as of the end of the fiscal year of the Company immediately preceding the date of death of either Linda Cummings or of the later to

294936v10                                   6

die of Lesher and Mitchell Hyman, as the case may be, as determined by an independent appraiser retained and paid for by the Company. Upon the issuance of the Transfer Notice (as provided in Section 5(e) below), the surviving Shareholder and the other Shareholder's representative will have ten (10) days to agree upon an independent appraiser to determine the fair market value of the Shares. In the event that the parties are unable to agree upon an appraiser within such time, the appraiser shall be selected by Ira Herzog. Such exercise price shall be payable by delivering cash and an Installment Note as described in Section 7.

(d)     Closing. The purchase and sale of Available Shares by the Company or a Shareholder pursuant to this Section 5 shall otherwise be on the terms and conditions set forth in Section 7 hereof.

(e)     Order of Priority. Upon the death of Linda Cummings with respect to the Shares owned by the Estate of Cummings or the death of both Lesher and Mitchell Hyman with respect to the Shares owned by the Estate of Hyman, such Shareholder's legal representative shall be immediately required to offer the Available Shares for sale first, to the Company, and second, to the other Shareholders, in accordance with the following procedures:

(i)     The Company shall deliver a written notice (the "Transfer Notice") to the legal representative of the Transferor and to each of the other Shareholders entitled to receive an offer to purchase Shares under the provisions of this Agreement.

(ii)     The Transferor's legal representative shall be deemed to first offer to sell the Shares to the Company, which shall have the longer of fifteen (15) days after (i) the date of the Transfer Notice and (ii) a determination by an independent appraiser of the fair market value pursuant to Section 5(c) above, to elect to purchase all or any portion of the Shares being offered to it (the "First Company Option Period"). The Company shall make such election by giving notice during the First Company Option Period to all of the Shareholders, including the Transferor's legal representative, and to each of its Directors, of the number of Shares to be purchased by the Company. All Shareholders, including the Transferor's legal representative, agree to execute and deliver such instruments and to take such actions to accomplish any reduction in stated capital or transfers of earned capital surplus which may be necessary to make such purchase lawful under applicable law, and the Company shall not elect to purchase any Shares to the extent such purchase would constitute a material violation of any material provision of any instrument, agreement, lease or other contract by which the Company or any of its properties is bound, or would constitute, after giving effect to any permitted reduction in stated capital or transfers from capital or earned surplus, a violation of any applicable law or any regulation, order or judgment of any court or governmental authority.

(iii)     If the Company shall not accept the offer pursuant to subparagraph (ii) above to purchase all of the Transferor's Shares, the Transferor's legal representative shall be immediately deemed to have offered the Shares to the Shareholders who are members of the Shareholder Group of which the Transferor is not a member. Such Shareholders shall have fifteen (15) days after the expiration of the First Company Option Period (the "Shareholder Option Period") to purchase all or any portion of the Shares being offered to them. Any of such

Shareholders may, by written notice to the Transferor, accept, in whole or in part, such offer to sell the Shares. Such acceptance shall specify the number of Shares to be purchased by such Shareholder.

        (iv)    If the Company and the Shareholders shall not accept the offer pursuant to subparagraphs (ii) and (iii) above to purchase all of the Transferor's Shares, the Company shall have an additional fifteen (15) day period after the expiration of the Shareholder Option Period (the "Second Company Option Period") in which to elect to purchase all or a portion of the Shares. The Company shall make such election by giving notice during the Second Company Option Period to all the Shareholders, including the Transferor's legal representative, and to each of its Directors, of the number of Shares to be purchased by the Company. All Shareholders, including the Transferor's legal representative, agree to execute and deliver such instruments and to take such actions to accomplish any reduction in stated capital or transfers of earned or capital surplus which may be necessary to make such purchase lawful under applicable law, and the Company shall not elect to purchase any Shares to the extent such purchase would constitute a material violation of any material provision of any instrument, agreement, lease or other contract by which the Company or any of its properties is bound, or would constitute, after giving effect to any permitted reduction in stated capital or transfers from capital or earned surplus, a violation of any applicable law or any regulation, order or judgment of any court or governmental authority.

        (v)    In the event that the Company and/or the other Shareholders shall not agree to purchase all of the Shares offered for sale by the Transferor's legal representative, the Transferor's legal representative shall have the right at the Transferor's legal representative election:

        (A)    to proceed with the sale of such Shares as the Company and the other Shareholders have agreed to purchase; or

        (B)    to cancel all of the offers to the Company and the other Shareholders.

        (vi)    The purchase and sale of Shares by the Company or a Shareholder pursuant to this Section 5(e) shall be on the terms and conditions in accordance with Section 7 hereof.

6.    Transfer of Shares in Violation of this Agreement. In the event any Shareholder (a "Breaching Shareholder") (i) transfers or disposes of such Shareholder's Shares in any manner without complying with the provisions of this Agreement, (ii) has any of his, her or its Shares taken in execution or sold to or by a third party in any voluntary or involuntary legal proceeding, execution, sale, bankruptcy, insolvency or in any other manner, (iii) shall violate the provisions of Section 12 hereof, or (iv) with respect to Linda Cummings (x) Linda Cummings fails to comply with any decision of the Mediator within a period of two (2) years from the date hereof, (y) Linda Cummings breaches the representation or warranty made in Section 10(c) hereof or such representation and warranty shall otherwise become untrue or (z) Kurfirst interferes with any business of the Company or the Ramones or takes any action adverse to the Company, the

Ramones or its business including, without limitation, failing to present any business opportunity related thereto of which he becomes aware to the Board of Directors; then the Company and the non-Breaching Shareholder shall, upon actual notice thereof, in addition to any other rights and remedies provided herein, have the option to purchase all or any portion of such Shares from the Breaching Shareholder thereof at the fair market value thereof as determined by an independent appraiser retained and paid for by the Company, and upon the terms and conditions set forth in Section 5 hereof (with all shares held by the Breaching Shareholder deemed to be "Available Shares"), except that, in the case of a transfer described in part (i) above, the purchase price shall not exceed the amount paid for said Shares by the purported transferee.

7.      Terms for Purchases of Shares.

(a)      Closing Provisions. The closing of any purchases of Shares pursuant to Sections 3, 4 or 5 hereof shall take place at the office of the Company on a date (the "Closing Date") and at a time designated by the Company and/or the purchasing Shareholder(s) and, in the case of a sale pursuant to Section 5 hereof, not later than nine (9) months following the date the Shares being purchased were deemed to be first offered pursuant to such Section. On the Closing Date, each selling Shareholder shall deliver (in the manner set forth in Section 7(c) hereof) a certificate or certificates for the Shares being sold, and the Company and/or the purchasing Shareholder(s) shall deliver a certified or bank cashier's check in an amount equal to the purchase price; provided, however, that in the case of a sale of Shares pursuant to Sections 5 hereof, the purchase price may be payable 20% by certified or bank cashier's check and the balance, 80%, of the purchase price shall be deferred and shall be paid in accordance with the provisions of Section 7(b) hereof. In the event a selling Shareholder shall fail to deliver certificates for the Shares being sold, the Company and/or purchasing Shareholder shall be deemed to be the owner of such Shares upon depositing the purchase price therefor with the Company to be held in trust pending receipt of the certificates evidencing the Shares to be sold.

(b)      Installment Note.

(ii)      In the case of a purchase of Shares pursuant to Section 5 hereof, the deferred portion of the purchase price shall be evidenced by an interest bearing installment promissory note from the Company and/or each purchasing Shareholder (each, an "Installment Note") in an amount equal to such purchaser's share of the deferred purchase price. Each Installment Note will be secured by a pledge of the Shares purchased by the issuer of such Installment Note.

(iii)      Interest on the unpaid principal amount of each Installment Note shall be payable quarterly from and after the Closing Date at the prime commercial loan rate from time to time in effect on unsecured ninety (90) day loans to the most responsible and substantial corporate borrowers of Citibank N.A. The principal balance of each Installment Note shall be payable in five equal annual installments, with one such installment being payable on each of the first five anniversaries of the Closing Date. Each Installment Note shall provide for acceleration of the due date of said Note upon (A) any default in the payment of any installment of principal or interest which continues for ten (10) days after written notice thereof, (B) the payor generally

not paying his debts as such debts become due, (C) the payor making a general assignment for the benefit of creditors, or (D) any proceeding being instituted by or against the payor seeking to adjudicate him a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of him or his debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, or other similar official for him or for any substantial part of his property. Each payor shall have the right to prepay, at any time and without penalty, his Installment Note in whole or in part.

(c)     Delivery of the Share Certificates. On the Closing Date, each selling Shareholder shall deliver a certificate or certificates evidencing the Shares being purchased pursuant to Section 5 hereof to the Company and/or the purchasing Shareholders; provided, however, that in the event of a purchase of Shares pursuant to Section 5 hereof, such certificate or certificates shall be delivered to the attorney for the Company who shall hold such certificate(s) in escrow as collateral to secure the payment of each Installment Note in full. When an Installment Note has been paid in full, said attorney shall, upon receipt of written notice to such effect from the payee of such Note, deliver to the maker of said Note, a certificate for the Shares purchased by said maker. Each such certificate shall be duly endorsed to the purchaser and shall have appropriate tax transfer stamps affixed thereto together with a certificate to the effect that each such selling Shareholder has good and marketable title to such Shares, that the transfer of such Shares has been duly authorized by all appropriate legal or other action, that such Shareholder has all requisite power and authority to transfer such Shares and that such Shares are being transferred free and clear of all liens, claims or other encumbrances. During the period that the certificate(s) shall be held in escrow, the selling Shareholder(s) shall not be deemed a shareholder of the Company and shall not be entitled to exercise any voting rights with respect to the Shares evidenced by the certificate(s) or to receive any dividends or other emoluments from or by reason of said Shares. Subject to the security interest granted the selling Shareholder(s) pursuant to this subparagraph (c), each purchasing Shareholder, if any, shall have all of the rights of ownership with respect to the Shares it or he has purchased, including, without limitation, the right to vote said Shares and to receive any dividends or other emoluments from or by reason of said Shares.

(d)     Default in the Payment of an Installment Note. Upon default in the payment of an Installment Note, the selling Shareholder shall have all rights of a secured party under the applicable default provisions of the Uniform Commercial Code, Secured Transactions, as then in effect under the laws of the State of New York, which rights are incorporated herein by reference. In such event, the sole obligation of the attorney acting as escrowee is to deliver the Shares held in escrow to the selling Shareholder, upon receipt of written notice of default from the payee of such Note.     The escrowee shall not have any liability except for its own fraud or gross negligence.

(e)     Survival.     The provisions of this Section 7 shall survive termination of this Agreement.

8.     Share Certificates.

(a)     Restrictive Endorsement.  Each certificate representing Shares now or hereafter held by a Shareholder shall be stamped with a legend in substantially the following form:

"The shares represented by this certificate are subject to an Amended and Restated Shareholders' Agreement dated as of April ___, 2005, a copy of which is on file at the office of the Company and will be furnished to any prospective purchasers on request. Such Shareholders' Agreement provides, among other things, for certain restrictions on the voting, sale, transfer, pledge, hypothecation or other disposition of the shares represented by this certificate."

Each Shareholder agrees that he shall deliver all certificates for Shares owned by him to the Company for the purpose of affixing such legend thereto.

(b)     Replacement Certificates.  Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of any certificate representing Shares issued hereunder and of a bond or other indemnity reasonably satisfactory to the Company (which in the case of any Shareholder that is an institutional investor or the beneficial owner of 5% or more of the outstanding Shares, may be an indemnity letter executed by such Shareholder), and upon reimbursement to the Company of all reasonable expenses incident thereto, and upon surrender of such certificate, if mutilated, the Company will make and deliver a new certificate of like tenor in lieu of such lost, stolen, destroyed or mutilated certificate.

9.     Certain Representations, Warranties and Covenants.

(a)     Income Distribution.

(i)     Thomas Erdelyi.

(A)     Each Shareholder acknowledges and agrees that Thomas Erdelyi p/k/a Tommy Ramone ("Erdelyi") was a previous shareholder of the Company. In exchange for Erdelyi's equity interest in the Company, the Company granted Erdelyi an exclusive license to use and exploit the name "Tommy Ramone" for purposes of advertising and trade and for product endorsements and merchandising rights of any nature whatsoever.

(B)     Each Shareholder agrees that, pursuant to a letter agreement between the Company and Erdelyi (the "Erdelyi Agreement"), attached hereto as Exhibit A, the Company shall pay Erdelyi a percentage of any royalties generated by the masters and copyrights for which Erdelyi recorded or wrote music, as set forth on Schedule 2 hereto. Such royalty payment shall be made or cause to be made to Erdelyi by the Company no later than one hundred twenty (120) days after each of June 30th and December 31st of each year.

(C)     Each Shareholder agrees that the Company shall pay Erdelyi a percentage of any proceeds generated by the sale of any merchandise bearing the resemblance, likeness or professional name of "Tommy Ramone", as more fully described in the Erdelyi Agreement.  Such payment shall be made or cause to be made to Erdelyi by the Company no later

than one hundred twenty (120) days after each of June 30th and December 31st of each year.

       (ii)    <u>Douglas Colvin</u>.

       (A)    Each Shareholder acknowledges and agrees that Douglas Colvin p/k/a Dee Dee Ramone ("<u>Colvin</u>") was a previous shareholder of the Company. In exchange for Colvin's equity interest in the Company, the Company granted Colvin an exclusive license to use and exploit the name "Dee Dee Ramone" for purposes of advertising and trade and for product endorsements and merchandising rights of any nature whatsoever.

       (B)    Each Shareholder agrees that, pursuant to a letter agreement between the Company and Colvin (the "<u>Colvin Agreement</u>"), attached hereto as <u>Exhibit B</u>, the Company shall pay Colvin a percentage of any royalties generated by the masters and copyrights for which Colvin recorded or wrote music, as set forth on <u>Schedule 3</u> hereto. Such royalty payment shall be made or cause to be made to Colvin by the Company no later than one hundred twenty (120) days after each of June 30th and December 31st of each year.

       (C)    Each Shareholder agrees that the Company shall pay Colvin a percentage of any proceeds generated by the sale of any merchandise bearing the resemblance, likeness or professional name of "Dee Dee Ramone", as more fully described in the Colvin Agreement. Such payment shall be made or cause to be made to Colvin by the Company no later than one hundred twenty (120) days after each of June 30th and December 31st of each year.

       (iii)    <u>Previous Band Members</u>.

       (A)    Each Shareholder agrees that, pursuant to a letter agreement between the Company and each of the previous band members of the Ramones, Richard Reinhardt p/k/a "Richie Ramone", Marc Bell p/k/a "Marky Ramone" and Christopher James Ward p/k/a "CJ Ramone" (the "<u>Previous Members' Agreement</u>"), substantially in the form attached hereto as <u>Exhibit C</u>, the Company shall pay a percentage of royalties generated by the masters and copyrights for which each previous band member recorded or wrote music, as set forth on <u>Schedule 4</u> hereto. Such royalty payment shall be made or cause to be made to each previous band member by the Company no later than one hundred twenty (120) days after each of June 30th and December 31st of each year.

       (B)    Each Shareholder agrees that the Company shall pay the previous band members of the Ramones, Richard Reinhardt p/k/a "Richie Ramone", Marc Bell p/k/a "Marky Ramone" and Christopher James Ward p/k/a "CJ Ramone," a percentage of any proceeds generated by the sale of any merchandise bearing the resemblance, likeness or professional name of "Richie Ramone," "Marky Ramone" or "CJ Ramone," as the case may be, as set forth on <u>Schedule 5</u> hereto, as more fully described in the Previous Members' Agreement. Such payment shall be made or cause to be made to each previous band member by the Company no later than one hundred twenty (120) days after each of June 30th and December 31st of each year.

       (iv)    <u>Retention of Income</u>. Subject to the distributions made in subsections (i)-

(iii) above, the Company shall retain at least 10% (subject to adjustment as determined by the unanimous consent of the Board of Directors) of the income otherwise distributable to the Shareholders, which amount shall be applied to the funding of resources that shall be necessary to permit the Company to continue its daily business activities.

(b)     Merchandising. The Company, through its directors and officers, shall control the exploitation, merchandising and licensing of memorabilia, products, apparel and intellectual property (collectively, the "Intellectual Property") related to the Ramones.   Subject to the unanimous consent of the Board of Directors and Section 12(b)(iv), no Shareholder shall individually exploit, merchandise or license the Ramones' memorabilia, products, apparel or intellectual property for product endorsements and merchandising rights of any nature whatsoever.   Each Shareholder agrees to execute, or cause the Company to execute, such additional agreements, instruments or documents necessary to assign, reflect or perfect ownership of the Intellectual Property to, by or for the Company.

(c)     Company Filings.

(i)     State Qualifications. The Shareholders shall duly qualify the Company to do business in each jurisdiction in which the nature of its business or the ownership, leasing or holding of its properties makes such qualification necessary.

(ii)     Trademark Applications. The Shareholders shall cause the Company to file, at the Company's expense, all trademark, copyright or other intellectual property applications necessary to protect its interests in the intellectual property it owns.

10.   Arbitration.

(a)     Any dispute, controversy or claim arising under, out of or in connection with or relating to this Agreement, and any amendment, breach or alleged breach hereof, shall be determined and settled by arbitration pursuant to the rules then in effect of the American Arbitration Association ("AAA"). The proceedings shall be administered by the AAA and shall take place in New York City. Any such award shall be final and binding on the parties thereto and a judgment thereon may be entered in any court having jurisdiction thereof.

(b)     The parties hereto agree and declare that legal remedies may be inadequate to enforce the provisions of this Agreement and that a party or parties may apply to an arbitrator for equitable relief, including specific performance and injunctive relief, to enforce the provisions of this Agreement.  Such right to specific performance or to an injunction, however, shall be cumulative and in addition to any other remedies a Shareholder or the Company may have.  In the event that a Shareholder is found by an arbitrator to have breached this Agreement, such Shareholder shall pay all arbitration costs and reasonable attorneys' fees incurred by the other Shareholders or the Company in obtaining such specific performance or injunctive relief.

(c)     Linda Cummings hereby represents and warrants to the Company and the Estate

of Hyman that she is the legal representative of the Estate of Cummings and is legally and duly authorized to act on its behalf. Linda Cummings and the Estate of Cummings hereby agree to indemnify and hold harmless the Company and the Estate of Hyman from any breach of such representation and warranty or should such representation and warranty be or become untrue. Based upon such representation and warranty and Linda Cummings entering into this Agreement on behalf of the Estate of Cummings and subject to compliance by Linda Cummings and the Estate of Cummings with the other terms and provisions hereof, the Estate of Hyman hereby agrees to withdraw the pending Arbitration without prejudice.

11.     Recapitalizations, Exchanges, etc., Affecting the Shares.     The provisions of this Agreement shall apply, to the full extent set forth herein with respect to the Shares, to any and all shares of capital stock of the Company which may be (i) issued in respect of, in exchange for, or in substitution of the Shares, by reason of a stock dividend, stock split, stock issuance, reverse stock split, combination, recapitalization, reclassification merger, reorganization or similar event or (ii) issued in respect of any stock option or other plan of the Company.

12.     Confidentiality and Non-Competition.

        (a)     Non-Disclosure.

                (i)     Confidentiality.  As a result of his relationship with the Company or its Affiliates, each of the Shareholders acknowledges that he may have or will have access to and become familiar with various trade secrets, including but not limited to technical know-how, processes, inventions, compilations of information, records, sales procedures, licensing agreements and relationships, methods of doing business and other confidential information that are owned by the Company or its Affiliates or used or will be used in the operation of the Company's business (the foregoing being collectively referred to as "Proprietary Information"). Each Shareholder acknowledges that all items of such Proprietary Information are valuable, special, and unique assets of the Company or its Affiliates, the disclosure of which may cause substantial injury and loss of profits and goodwill to the Company or its Affiliates.  Each Shareholder therefore agrees that he will not directly or indirectly (except as required by law or as required pursuant to some other relationship with the Company or its Affiliates) use, disclose, or disseminate any such Proprietary Information.  All obligations of confidence, pursuant to and in accordance with the provisions of this Section 12, will be terminated with respect to any particular portion of Proprietary Information which (1) is, or through no fault of a Shareholder becomes, published or otherwise available to others or the public under circumstances such that the public may utilize such Proprietary Information without any direct or indirect obligation to the Company, (2) is, or at any time may be, acquired by a Shareholder from any third party rightfully, possessed of the Proprietary Information and having no direct or indirect obligation to the Company with respect to same, or (3) is communicated in response to a valid order by a court or other governmental body in a manner which makes such communication a matter of public record.  Further and without limitation on any particular obligation of confidence recited herein, the parties hereto will not be permitted to justify disregarding the obligations of confidence herein by using the Proprietary Information to guide a search for publications or other publicly available information, and fitting together the information contained therein to contend

Proprietary Information is in the public domain.

(ii)     Return of Proprietary Information.  Upon a Shareholder ceasing to own its Shares, such Shareholder will return all Proprietary Information which is in a tangible form to the Company and will destroy any Proprietary Information located on any computer storage within the possession or control of the Shareholder.  In addition, the Shareholder will provide the Company with a sworn affidavit that he has complied with this subsection (ii) within thirty (30) days of his ceasing to own Shares in the Company.

(b)     Non-Competition.

(i)     Basis of Covenants.  Each Shareholder stipulates and agrees that each other Shareholder's decision to enter into this Agreement is induced primarily because of the covenants and assurances made by each Shareholder in this Agreement that irrevocable harm and damage will be done to the Company if such Shareholder violates the obligation to maintain the confidentiality of Proprietary Information, or competes with the Company.  Each Shareholder further stipulates and agrees that the consideration given by the Company in granting such Shareholder access to the Proprietary Information of the Company gives rise to the Company's interest in the promises made by each Shareholder in this Section.  Further, each Shareholder stipulates that the promises each Shareholder makes in this Section are designed to enforce the promises made by the Shareholder, including those set forth in Section 12(a).  As used in this Section 12(b), the term "Company" shall include the Company and any of its subsidiaries and Affiliates.

(ii)     Non-Solicitation Covenant.  Except as provided in Section 12(b)(iv), each Shareholder agrees that during the term of this Agreement and for a period of twelve (12) months following termination of this Agreement, for whatever reason, each Shareholder will not solicit, contact, or otherwise communicate with any person, company or business that at any time during the twelve (12) months preceding termination of this Agreement transacted business with the Company or direct anyone, on his behalf, to solicit, contact, or otherwise communicate with any person, company or business that at any time during the twelve (12) months preceding termination of this Agreement transacted business with the Company, or was solicited by, contacted by or communicated with the Company as prospectively transacting business with the Company.

(iii)     Non-Interference Covenant.  Except as provided in Section 12(b)(iv), each Shareholder covenants and agrees that, during the term of this Agreement and for a period of twelve (12) months following termination of this Agreement, for whatever reason, each Shareholder shall not recruit, hire or attempt to recruit or hire, directly or by assisting others, any employees or consultants of the Company, nor shall such Shareholder contact or communicate with any employees or consultants of the Company for the purpose of inducing any employees or consultants to terminate their employment or relationship with the Company.

(iv)     Permitted Competition.  Each Shareholder is granted an exclusive license to its respective professional name ("Joey Ramone" or "Johnny Ramone," as the case may be) to

294936v10                                          15

use and exploit it in all industries, including, but not limited to, motion pictures, television, radio, music publishing and songwriting, literary writing and publishing, theatrical engagements, personal appearances, public appearances, recordings reproduced by any method now known or hereafter known, publications, likeness, biographical material, voice and talents for purposes of advertising and trade and for product endorsements and merchandising rights of any nature whatsoever.

        (v)    Remedies.

        (A)    This Section 12(b) shall be construed as an agreement ancillary to the other provisions of this Agreement and the existence of any claim or cause of action of any Shareholder against the Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of this covenant. Without limiting other possible remedies to the Company for breach of this covenant, each Shareholder agrees that injunctive or other equitable relief will be available to enforce the covenants of this provision, such relief to be without the necessity of posting a bond, cash, or otherwise.

        (B)    If any Shareholder violates any of the covenants of this Section 12(b), the term of the restriction violated shall be extended by the amount of time that such Shareholder was in violation.

        (C)    The Company and each Shareholder further agree that if any restriction contained in this Section 12(b) is held by any appropriate forum to be unenforceable or unreasonable, a lesser restriction will be enforced in its place and remaining restrictions contained herein will be enforced independently of each other.

        (c)    Binding Effect.  The provisions of this Section 12 shall be binding upon each Shareholder, its agents, representatives, beneficial owners, and each Shareholder shall take all steps necessary or appropriate to assure that its agents, representatives and beneficial owners comply herewith.

13.    Termination of Agreement.

        (a)    Subject to the terms of Section 13 hereof, except as otherwise provided herein, this Agreement shall continue in force and effect until the earliest to occur of any of the following events, at which time this Agreement shall automatically terminate; provided, however, the restrictions set forth in Section 13 hereof shall survive the termination of this Agreement:

        (i)    Unanimous written consent of all Shareholders; or

        (ii)    Cessation of the Company's business.

(b)     Nothing contained in this Section 13 shall affect or impair any rights or obligations arising prior to or at the time of, or that may arise by an event causing the termination of, this Agreement pursuant to Section 13(a) hereof.

14.   Miscellaneous.

(a)     Notices.  Any and all notices, designations, consents, offers, acceptances, or any other communication provided for herein shall be given in writing by registered or certified mail which shall be addressed, (i) in the case of the Company, to Herzog & Straus, C.P.A., 156 West 56th Street, 4th Floor, New York, New York 10019, Attention: Ira Herzog, with a copy to Pryor Cashman Sherman & Flynn LLP, 410 Park Avenue, New York, New York 10022, Attention: Brad D. Rose and a copy to _____,
Attention: _____; and (ii) in the case of any Shareholder, to the address of the Company referred to above (or to such other address as may be designated by such party). Except as otherwise provided in this Agreement, each such notice shall be deemed given at the time it shall be mailed in any post office or branch post office regularly maintained by the United States Government.

(b)     Amendment.  No change or modification of this Agreement shall be valid unless the same shall be in writing and signed by Shareholders holding 75% of all issued and outstanding Shares held by Shareholders hereunder; provided, however, that any such amendment which shall adversely affect the rights of any Shareholder hereunder shall not be effective against such Shareholder without the written consent of such Shareholder.

(c)     Waiver.  No failure or delay on the part of the parties or any of them in exercising any right, power or privilege hereunder, and no course of dealing between the Company and the parties or any of them shall operate as a waiver thereof nor shall any single or partial exercise of any right, power or privilege hereunder preclude the simultaneous or later exercise of any other right, power or privilege.  The rights and remedies herein expressly provided are cumulative and not exclusive of any rights or remedies which the parties or any of them would otherwise have. No notice to or demand on the Company in any case shall entitle the Company to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the parties or any of them to take any other or further action in any circumstances without notice or demand.

(d)     Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

(e)     Governing Law.  This Agreement shall be governed and construed in accordance with the laws of the State of New York without giving effect to the choice of law provisions thereof.

(f)     Benefit and Binding Effect.  This Agreement shall be binding upon and shall inure to the benefit of the Company, its successors and assigns, and each of the other parties hereto and

their respective executors, administrators and personal representatives and heirs, beneficiaries, successors and permitted assigns. In the event that any part of this Agreement shall be held to be invalid or unenforceable, the remaining parts thereof shall nevertheless continue to be valid and enforceable as though the invalid portions were not a part hereof. This Agreement shall become effective on the date first above written.

(g)     Third Parties. None of the provisions of this Agreement shall be for the benefit of or enforceable by any persons not a party to this Agreement.

(h)     Gender; Tense, Etc. Where the context or construction requires, all words applied in the plural shall be deemed to have been used in the singular, and vice versa; the masculine shall include the feminine and neuter, and vice versa; and the present tense shall include the past and future tense, and vice versa.

(i)     Entire Agreement. This Agreement (including other documents or instruments attached or required to be delivered in connection herewith) constitutes the entire agreement between the parties hereto and supersedes all prior agreements and understandings, oral or written, between any of the parties hereto with respect to the subject matter hereof.

IN WITNESS WHEREOF, the parties hereto have signed this Agreement as of the day and year first above written.

RAMONES PRODUCTIONS, INC.

By:     ~~John Cummings~~ Charlotte Lesher, CEO
        ~~President~~

ESTATE OF JEFFREY HYMAN

By:     Charlotte Lesher
        Charlotte Lesher
        Representative

By:     Mitchel Hyman
        Mitchell Hyman
        Representative

John Family Trust of 1997, u/d/t

2/12/97, Linda Cummings, Trustee

By: _____
Linda Cummings
Representative

# SCHEDULE 1

## Company Ownership

| Shareholder | Number of Shares Owned | Equity Interest |
| --- | --- | --- |
| HYMAN GROUP | | |
| Estate of Jeffrey Hyman | 100 Shares of Common Stock | 50% |
| CUMMINGS GROUP | | |
| Estate of Cummings | 100 Shares of Common Stock | 50% |

294936v10

# SCHEDULE 2

## Thomas Erdelyi's Masters and Copyrights

## SCHEDULE 3

### Douglas Colvin's Masters and Copyrights

# SCHEDULE 4

## Previous Band Members' Masters and Copyrights

# EXHIBIT A

## Thomas Erdyelyi Letter Agreement

## EXHIBIT B

### Douglas Colvin Letter Agreement

# EXHIBIT C

## Previous Members' Letter Agreement

294936v10